BOLGER *v.* COMMON COUNCIL OF THE CITY OF DETROIT.

1. MUNICIPAL CORPORATIONS—DETROIT CHARTER—OFFICERS—REMOVAL—PROCEDURE.

Under section 4, Act No. 417, Local Acts 1901, amendatory of the charter of Detroit, providing the procedure for removal of the commissioner of parks and boulevards, the commissioner can be removed only upon a showing of legal cause, the legal sufficiency of which cause is a question for the court.

2. SAME—GROUNDS OF REMOVAL—CHARGES—SUFFICIENCY.

Charges of gross neglect of duty by the commissioner, consisting of failure to protect the city in contracts let by him and to inspect or provide for proper inspection of public work being done under his direction, examined, and *held*, legally sufficient, if sustained by the proof, to authorize his removal.

3. SAME—GROSS NEGLECT OF DUTY—WHAT CONSTITUTES.

Gross neglect of duty, justifying the removal of a public officer, is not limited to intentional official wrongdoing, but extends to any neglect of official duty which permits the public interests to be injured or endangered, and which, from the gravity of the case, or the frequency of instances, becomes so serious in its character as to endanger or threaten the public welfare.

4. SAME—RELIANCE UPON SUBORDINATES—RESPONSIBILITY.

The commissioner, having authority to "employ and at his pleasure discharge superintendents, engineers," etc., though entitled to rely to some extent upon their reports, could not rely upon them wholly, nor to the extent that he might if they were appointed by others and not entirely subject to his own discretion; and in proceedings for his removal it was a question for the council whether it was not gross negligence for him to rely upon his subordinates to the extent which the evidence indicated he did.

5. SAME—EVIDENCE—SUFFICIENCY.

Evidence in proceedings to remove the commissioner for gross neglect of duty examined, and *held*, to support the finding of guilty, especially as the six judges of the Wayne circuit court unanimously came to the same conclusion.

6. SAME—TRIAL—VIEW—PROPRIETY.

The proceedings being based upon charges of gross neglect of duty in respect to public improvements being done under the commissioner's direction, it was competent for the council to examine the work in order to have a better understanding of the testimony, especially where such examination was made in the presence of counsel for the commissioner and without objection from him.

7. SAME—REVIEW—CERTIORARI—SCOPE.

The action of the council in removing the commissioner, upon charges of gross neglect of duty, was properly sustained upon certiorari, against the objection that the council should have voted separately upon each charge and specification thereunder, and upon the question of removal, since the writ, being largely discretionary, is not granted in such cases upon purely technical grounds, and it is presumable that each alderman who voted for the affirmative upon the resolution of removal passed upon every one of the charges and specifications enumerated therein, and upon the question of removal.

8. SAME—NEGLECT OF DUTY—FINANCIAL LOSS TO CITY.

The facts that the city was fully protected against financial loss by bonds; that the work had not been finally accepted by the commissioner; that the contractors were bound to make good all defects in work or materials; and that the commissioner, according to his testimony, intended to make an accurate final inspection of the completed work and to require it to conform in all respects to the contract, were not so inconsistent with the charges of gross negligence as to invalidate the findings of the council, since it was the duty of the commissioner to inspect the work as it proceeded, and the bonds and the provisions of the contract did not dispense with the necessity for careful supervision, but furnished an additional remedy in case, with proper inspection during its progress, the improvement was found in any respect imperfect.

9. SAME—DEFENSES—LACK OF FINANCIAL LOSS—EFFECT.

If, acting upon competent evidence, the council were satisfied that the commissioner's performance of his duties evidenced such gross negligence as to indicate that his further continuance in office would be a menace to the public, his removal would not be improper for the reason that, in the end, the city would suffer no financial loss.

10. SAME—LOSS TO PUBLIC—FINANCIAL LOSS.

    Because the contractors had given bonds for the protection of the public against any money loss, it does not necessarily follow that no loss would have been suffered, since the inconvenience of the public during the period when necessary repairs or rebuilding would have to be done, a period in which, had the contract been performed according to its tenor, the public would have been entitled to the free and unobstructed use of the improvement, is an element of loss quite as important and worthy of consideration as a mere financial loss.

Error to Wayne; Brooke, Rohnert, Mandell, Donovan, Hosmer, and Murphy, JJ. Submitted June 19, 1908. (Docket No. 71.)   Decided July 1, 1908.

Certiorari by Robert E. Bolger to review proceedings by the common council of the city of Detroit to remove plaintiff from the office of commissioner of parks and boulevards. There was judgment sustaining the proceedings, and plaintiff brings error. Affirmed.

*Alex. J. Groesbeck, Edwin Henderson,* and *John J. Speed,* for appellant.

*Frazer, Griswold & Slyfield,* for appellee.

BLAIR, J.   The record in this case is before us upon writ of error to review proceedings before the full bench of the circuit court for the county of Wayne upon common-law certiorari to the common council of the city of Detroit, to review their action in removing the plaintiff in error from his office as commissioner of parks and boulevards.

On the 30th of January, 1906, the committee on parks and boulevards of said common council preferred certain charges against Mr. Bolger, of which the council found the following were sustained by the proofs:

"*First Charge.* Your committee charge that Robert E. Bolger, commissioner of parks and boulevards of the city of Detroit, was and is guilty of gross negligence and unlawful conduct in his office, in connection with the contracts let to Thomas Kennedy, for the paving of Lafayette boulevard, and on the Eastern boulevard, St. Aubin to Chene and Mack to Gratiot.

"*Specification.* The contract for said work, the specifications and blue print drawings called for eight inches of concrete behind the curb, six inches below the curb

and six inches in front of the curb. These specifications were deliberately and intentionally disregarded by the said contractor, and the men laying the same were instructed not to put in the quantity of concrete required by the said plans and specifications; that in many instances dirt was thrown in behind the curb in the place of concrete, large and unsuitable stone without sufficient quantity of cement to bind them together, and the quantities of stone were greatly in excess in size of that required by the contract and specifications to constitute the concrete, and there was not enough cement used. That this condition of affairs was known to said commissioner, and that he was present upon the work and saw the concrete being put in behind the curb stone contrary to the specifications and blue prints which he had furnished to the contractor.

"*Second Charge.* We charge the said commissioner with neglect of his duties, unfitness and incompetency in the discharge of his duties in the matter of contracts with Lennane Bros., for paving the Boulevard, Vinewood to the railroad, Visgar to Buchanan and Hancock to Holden, and the speedway, and with Thomas Kennedy, in the matter of contracts as above mentioned.

"*First Specification.* That he did not furnish a sufficient number of inspectors upon the construction of the Boulevard pavement under the contracts let by him to Kennedy and to Lennane Bros., although he was informed they were needed, and that some of the work was done without any inspection at all. * * *

"*Third Specification.* That the commissioner, Robert E. Bolger, while frequently upon the work himself, made no inspection of the work whatever and that if he had done so he could easily have seen that the work was improperly done; that he did not provide competent men or sufficient number of men to make the inspection in case that he was unable to do so, or provide them with full profiles, drawings, plans and specifications, so that the inspectors could do competent and proper work.

"*Fourth Specification.* That the construction of the roadbed of said Boulevard paving was improperly and negligently done; that the limestone used was larger than the specifications permitted; that said roadbed was not in some places excavated as deep as it should have been excavated. That false amounts of excavation and of square yardage of pavement and of sewer pipe and of curbing were called for in the specification to a large

amount on the Lennane and Kennedy contracts above mentioned. That other portions of the road were not constructed in accordance with the requirements of the specifications; that the roadbed was not flooded and rolled, nor the different layers of stone as prescribed in the specifications; that granite or trap rock were not used as specified, screenings were not used to fill up the openings in the limestone, granite or trap rock, and that in other particulars the construction was imperfect and not in accordance with the terms of the specifications thereof, as said commissioner should have known, and might easily have discovered if he had properly discharged his duties, and given that inspection which his position required him to give.

"*Fifth Specification.* That said commissioner was aware before he let the said contract to Kennedy of his reputation for doing faulty work, and that said Kennedy would not be likely to do the job properly if the job were let to him, and that said commissioner disregarded these warnings. That said commissioner himself well knew said Kennedy's reputation, and knew the necessity of a close inspection of all the work done by him; that said commissioner, Robert E. Bolger, disregarded this fact and put an inadequate number of inspectors on the job. * * *

"*Fourth Charge.* Your committee charge that said Robert E. Bolger, commissioner of parks and boulevards, was grossly negligent in letting the contract for the construction of the Boulevard pavement in this: * * *

*Fifth Charge.* We charge that said commissioner was grossly negligent in accepting the estimates by Ray of work done and material furnished and making payment upon these estimates without proper investigation and scrutiny; that said Engineer Ray was a man of his own appointing and he had power to discharge him at will; and we charge that at no time from the beginning of the work until the end, did the commissioner give such personal attention to the inspection of the work and of the work itself as his manifest duties required him to do, and in this he was guilty of gross negligence. * * *

"*Eighth Charge.* We charge said Robert E. Bolger with incompetency, unfitness, gross neglect of duty in this:

"*Specification.* (*a*) That he adopted and approved plans, specifications, blue prints, and estimates for paving to be done upon the boulevards which were not designed

1908]   BOLGER v. DETROIT COMMON COUNCIL.   545

to and did not protect the best interests of the city of Detroit.

"(b) That in violation of the law, he changed said plans, specifications and blue prints after the bids and proposals on the same were made and received, by cutting off said plans and specifications part of the cement curb; in changing the course of the pavement at Lafayette and the Boulevard, and in the hauling of dirt from the Vinewood avenue job to Clark Park, instead of to Atkinson Park, as provided in said specification; that said changes were all made in the interests of the contractor, stifled competition, and were not in the interests of the city of Detroit.

"(c) That he advertised for bids to make a speedway forty (40) feet wide on the Western Boulevard, and let the contract to Lennane Bros. for thirty (30) feet wide, without readvertising the same.

"(d) That he allowed concrete to be put behind the curbing without in any manner providing for the composition or the component parts of the same, either as to stone, cement or other ingredients.

"(e) That he accepted bids on said work and let the contracts for the same without designating therein the kind of cement and without the bidders naming the kind of cement to be used.

"(f) That the reinforced cement curb was not constructed according to the specifications, but that the iron pipe of one inch dimension and the reinforcing rods and wires were not put therein as required by the specifications; that in about half of said work the same were entirely omitted, which was well known to said commissioner, or could have been easily known, had he made a personal inspection or provided for adequate and proper inspection of said work. * * *

"*Eleventh Charge.* That said Robert E. Bolger was and is guilty of unlawful acts in his office as park and boulevard commissioner, of gross negligence in the performance of his duties in said office, maladministration, incompetency and unfitness therein."

Certain other charges upon the application of Mr. Bolger for writ of prohibition were stricken out upon the hearing of that application by the court and the council was directed to proceed to a hearing upon the remaining charges.

On the 20th day of February, the common council took up the hearing of testimony in the case and continued said hearing until the 9th of April, when it passed the following resolution:

"It is resolved by the common council of the city of Detroit, and said council finds the facts as follows: That all said charges and specifications so preferred and heard and tried as aforesaid are true, and are hereby declared duly sustained, and established, except the second specification of the second charge, and the third charge, and the specification under the fourth charge. * * * And therefore be it resolved further, that said Robert E. Bolger be and he is hereby removed from the office of and as commissioner of parks and boulevards of the city of Detroit, on account of and by reason of being guilty of the said several charges and specifications as aforesaid."

All charges reflecting upon the integrity of the commissioner were found to be not sustained and he was exonerated from any intentional wrongdoing.

Section 4 of Act No. 417 of the Local Acts of 1901 provides:

"The said commissioner may be removed by a vote of two-thirds of the members elect of the common council, but only upon written charges and an opportunity to appear and defend with the aid of counsel."

Sections 5 and 6 contain the following:

"SEC. 5. The commissioner of parks and boulevards shall appoint a secretary, who shall hold office during his pleasure, and shall make all needful general rules and regulations for the transaction of business of his department, and may employ and at his pleasure discharge superintendents, engineers, clerks, agents and subordinates, and prescribe their compensation. All officers and appointees, or either of them, shall give security for the faithful performance of their trust, as said commissioner may require.

"SEC. 6. The commissioner of parks and boulevards shall have the control and management, and shall have charge of the improvements of all the parks and public grounds of said city, including the island park, known as Belle Isle park, and of such parks and public grounds as

may hereafter be acquired, laid out, purchased or dedicated for public use in said city. And he shall likewise have the control, management and charge of the improvement and maintenance of the boulevard, which was laid out and established by the act creating said board of boulevard commissioners, and of any other boulevard which may at any time be hereafter acquired, laid out, established or located by said city."

At the hearing in question, Mr. Bolger was present at all the sessions, which occupied some 24 days. He was represented by counsel at all the hearings and testified fully in his own behalf. The resolution of removal was adopted by a majority of 23 to 11, constituting the necessary statutory number.

The same questions which are raised before us now were presented to the full bench of the Wayne circuit court and were resolved against the plaintiff in error by that court in a unanimous opinion, with which we might well content ourselves without further remarks. Inasmuch, however, as counsel for plaintiff strenuously insist that that there was no competent evidence presented before the council to sustain any of the charges or specifications, even if the same were sufficient in form, we briefly consider that question.

We agree with counsel for plaintiff in error that the provision of section 4 of the act of 1901 above quoted requires a showing of legal cause for removal and that the legal sufficiency of the cause of removal is a question for the court. We are of the opinion, however, that with the exception of the 4th and 11th charges, the charges were legally sufficient to authorize the removal of the commissioner, if sustained by the proof. In determining whether the charges were sustained by the proof, reference must be had to the powers conferred upon the commissioner.

It is contended by counsel for plaintiff in error:

" Only gross negligence resulting in damage will justify the removal of the incumbent of an office of the dignity and importance of the commissioner of parks and boulevards. Gross negligence is the intentional failure to per-

form a manifest duty. *Schindler* v. *Railway Co.*, 87 Mich. 411.

"Negligence is the unintentional failure to perform a duty implied by law, whereby damage naturally and proximately results to another. 21 Am. & Eng. Enc. Law (2d Ed.), p. 457."

In *Attorney General* v. *Jochim*, 99 Mich. 358, it was held that the secretary of State, State treasurer, and commissioner of the State land office, while acting as members of the board of State canvassers, were guilty of gross neglect of duty in certifying as correct a tabulated statement prepared by their clerks in reliance solely upon the statement of said clerks that said tabular statement was correct. In the course of the opinion by Mr. Justice HOOKER, he said:

"We come next to the charges. It is contended that they are insufficient, because the act is not alleged to have been intentional, and because it was not gross neglect to permit an erroneous canvass by clerks. * * * A mere failure to certify could be called 'neglect.' What shall be said of it when the certificate is made without knowledge of, or any attempt to ascertain, the fact? * * * Looking at the circumstances from his official standpoint, the governor may well have said this, though not willful, was only possible by reason of the grossest neglect of official duty. It certainly was someone's duty to move at once with a view to the correction of the error, and the prevention of its recurrence. While there is an inclination upon the part of the average American to accept good intentions as an excuse for mistakes, it is not for the general public good that responsible public offices shall be confided to, or remain in the custody of, those whose duties and responsibilities rest so lightly upon them as to permit the public interests to be injured or endangered through neglect; and when such neglect, from the gravity of the case, or the frequency of the instances, becomes so serious in its character as to endanger or threaten the public welfare, it is gross, within the meaning of the law, and justifies the interference of the executive, upon whom is placed, by this amendment, the responsibility of keeping the affairs of State in a proper condition. We cannot think that the term 'gross neglect' means only intentional

official wrongdoing.   Such acts would hardly be described by the word 'neglect.'"

While it is true that the act held to be gross neglect in the *Jochim Case* was one required to be personally performed by the officer himself, we think the definition of gross neglect given in the case is applicable to this case. It will be seen from the provisions of the statute relative to his office, that the commissioner is given very extensive powers,

"And may employ and at his pleasure discharge superintendents, engineers, clerks, agents and subordinates and prescribe their compensation."

While we agree with counsel for plaintiff in error that the commissioner was not required to abandon the performance of his other duties and give his entire time to the performance of the Boulevard work, and while he might, to a certain extent, rely upon the reports of his engineer as to scientific matters, which would not be expected to be within his knowledge, and, to a certain extent, upon the reports of his inspectors, it was not competent for him to rely wholly upon them or to the same extent that he might rely upon them if they were appointed by others and not entirely subject to his own discretion. They were his employés and agents and not the municipality's, subject to his arbitrary will, aiding him in the performance of the duties required of him, and he may justly be held responsible, to a large degree, for their performance of the duties delegated to them.   We think it was a question for the council in this case, whether it was not gross negligence in him to rely upon these officers to the extent to which the record indicates he did.

The testimony in this case is too voluminous for us to undertake to set forth those portions tending to sustain the several charges, but, as an illustration, we quote certain portions of the evidence in support of the third specification of the second charge.

Inspector Benedict, appointed by Mr. Bolger, testified:

"I didn't have the specifications for a week or ten days after I was there, and I went to Mr. Busch and he says: 'Have you got the contract, I mean the specifications,' and I said, 'No,' I said, 'I have not, and I do not know much about what is to be done,' and he said, 'I will see to that.' The next day he brought me up a contract; I mean the specifications. He did not bring me any blue print. Some days after I asked him about that. I says, 'I want something to show the grade and measurements,' and he said: 'I will bring you one,' and he did. He brought me a blue print and a cross cut of the work on the road and the curb. In a week or ten days before I got the specifications. Up to that time they had not been laying any curb. * * * When I went up on to the St. Aubin job no one was left on the Mack job as inspector. When I was down on the Mack job no one was up on the St. Aubin job as inspector. * * * I should say I was two or three weeks up there on that job before I came back again.

"*Q.* While you were up there two or three weeks there was no one left in your place to inspect the other job?

"*A.* No, sir. * * *

"*Q.* During your absence on the St. Aubin job they would be doing work upon the Mack job?

"*A.* Yes.

"*Q.* And there was no one there to inspect it as an inspector?

"*A.* Not to my knowledge. * * *

"*Q.* Was it possible for you to watch all of that work?

"*A.* Not and know that it was done properly. * * *

"*Q.* How many men were needed there on that work to inspect it properly and see that it was done right?

"*A.* At the time, all the time there were two curb setters working there should have been at least three men. The last two weeks or two and a half I was there I told Mr. Busch that I would have to have help in looking after it, and have it done properly, not only the curb setting, but they were leveling down these stones and putting them down, and I said: 'I am satisfied you want someone to look after that.' He said: 'I will chase somebody up there to help you.'

"*Q.* The work that you were doing there was really the work of three inspectors, or ought to take, rather, three inspectors to do that work properly?

"*A.* To watch it and know that it was done properly,

because I knew they were beating me all they could, and to watch it as it should be watched it needed more inspectors.

"*Q.* Then, in your judgment, based on your experience, there was not a sufficient number of inspectors on that work?

"*A.* I don't think there was. * * *

"*Q.* How often did you see Commissioner Bolger on that work?

"*A.* Well, at the first, when I went up there, he was up there to the best of my recollection, he was up there two or three times a week.

"*Q.* Was he ever up there when he could see these conditions were present that you talk about?

"*A.* He was up there, if I remember right, once when I was setting the curb. I didn't see him until he hit me on the shoulder and touched me. I turned around, and saw Mr. Bolger, and he was right there on the ground, and I should say he was about two-thirds of the way from Mack up to Gratiot.

"*Q.* Was that one of the times when these conditions were present that you talk about?

"*A.* Yes, sir. I was working at the two streets and looking after the two men, two curb setters.

"*Q.* Did he speak anything to you that there was work going on here and over there, and ask you if you could keep track of those different gangs?

"*A.* Not in those words, he didn't. He wanted to know how things were going. I says we are doing the best we can and he told me to have it—to watch it and see that it was right up to the specifications, and see to it and have it done right, and I will stand by you.

"*Q.* Did you consider that he could see as well as you could how much you could do, or how little?

"*A.* I considered that he ought to know how much a man could do, how much he can look after.

"*Q.* And the conditions were present there where he could see them just as well as you could?

"*A.* They certainly were.

"*Q.* And was that one of the reasons that you did not care to speak to him?

"*A.* That was really the only reason. * * * I supposed that the concrete behind the curb was to be 6 inches, but now it turns out that it is 8 inches.

"*Q.* Did any one tell you that it was to be 6 inches?

"*A.* Why, I always, I never heard anything but 6 inches. I never heard the word 8 inches mentioned by anybody until the committee came around on the upper north Boulevard, who was investigating, and one of the aldermen showed me that little bit of an 8, that figure 8 down in the cobble stone that I had never seen. *  *  *

"*Q.* Now, Mr. Benedict, speaking about this concrete behind the curb, as a matter of fact, in looking at that profile you overlooked the fact that there was 8 inches required behind the curb?

"*A.* That is right.

"*Q.* That is the truth of it?

"*A.* That is the truth of it.

"*Q.* And the fault of not having that concrete up to the requirements of the specifications, 8 inches, is due to an oversight in not seeing that 8 there?

"*A.* Yes. *  *  *

"*Q.* Didn't you know that your blue print called for 6 inches of cement in front of the curb, of concrete?

"*A.* No, I didn't know that.

"*Q.* You don't know that?

"*A.* I don't know that now.

"*Q.* As a matter of fact you put in 3 or 4?

"*A.* Yes, I didn't calculate to have it less than that."

Inspector Dilworth testified:

"*Q.* Now, as a matter of fact, with mixing boards 200 feet apart, Mr. Dilworth, don't you know that it needs two inspectors and haven't you said so?

"*A.* Why, it might need two inspectors, yes.

"*Q.* Doesn't it, as a matter of fact, to get a good job?

"*A.* Well, if you want to get it right down to a sixteenth of an inch I suppose you would have to do it.

"*Q.* But no, to get it down according to the specifications?

"*A.* It would be altogether on what kind of men you had on the board."

Inspector Beyers testified:

" I only got 5 inches of concrete behind the Berea curb. I was to blame for that. I made a mistake. I did not know they had changed from the usual way of putting it down. The usual way of putting it down is four inches to five, on city work. I inspected it the same as city

work.  I did not report to Mr. Bolger that we were putting in only five inches of concrete behind the curb.  The matter did not occur to me until this investigation came up, that I was doing something there which was outside of the specifications.  There might be between 5 and 6 thousand feet of that concrete behind the curb in there, between Hancock to Holden, the average width is 5 inches.  * * *  At one time I expressed to the superintendent, Mr. Busch, a desire to have an additional inspector.  They were finishing up the concrete curb, and started in on the Berea, and there is a block's difference between those two jobs.  I reported it to the engineer and superintendent.  They said they would send up another inspector, but I guess they forgot it.  * * * The first month Mr. Bolger was there almost every day. After that two or three times a week.  * * *

"I calculated to put 5 inches of concrete behind the curb.  I got that idea from the city work.  I was not furnished with a blue print of that curb.  If I had been there would have been 8 inches there.  I went to work upon that curb and didn't know it required 8 inches of concrete; the result is, it averaged 5 inches, and 3 inches in front.

"*Q.* You know that your blue print called for 6?

"*A.* I know it now.

"*Q.* When did you find it out?

"*A.* When the committee came out there."

It was conceded by counsel for plaintiff in error in his argument to the council that his client had had a fair trial, so far as the council was concerned, and that he was before them for trial upon the charges largely because he was a victim of misplaced confidence.  It was also conceded by counsel that the concrete behind the curb would have to come out.

Plaintiff's witness Chapoton testified:

"I examined the subgrade from Mack to Gratiot in 20 places about 100 feet apart.

"*Q.* About that?  How did the subgrade run — read off your figures?

"*A.* Starting from Gratiot road down, the first is 10, 9½, 8, 9½, 8½, 10, 10, 7½, 9½, 10, 9½, 9, 9½, 10, 8, 9½, 9, 9, 10 and 9, making a total of 187, divided by the 20 places, made it 9⅓ inches.

"*Q.* Very well, now then, the specification, do you know what they require on the subgrade, Mr. Chapoton; do you remember now?

"*A.* To be 10 inches down from the top of the curb.

"*Q.* That is the excavation of the roadway, isn't it?

"*A.* Yes, sir.

"*Q.* Now then, these specifications require all excavation shall be made to the depth as shown on profile after having been rolled?

"*A.* Yes.

"*Q.* Is that honest, fair work?

"*A.* Yes, sir.

"*Q.* To have a difference, a different depth from what is required by the specifications?

"*A.* No, sir.

"*Q.* It is not honest work, is it?

"*A.* No.

"*Q.* Would there be trouble in a contractor doing honest, square work there, to make that excavation originally?

"*A.* No, sir.

"*Q.* To the depth required by the profile, 10 inches, roll it and have it measured by the engineer?

"*A.* No, sir.

"*Q.* Isn't that the proper way where your specifications call for that?

"*A.* Yes, sir, I am sure.

"*Q.* That is the proper way? If there are any high places they can be taken off?

"*A.* Yes, sir.

"*Q.* And thrown up on the curb? These specifications require all filling; there may be depressions, and it takes a little careful work to get the subgrade right?

"*A.* Yes, sir.

"*Q.* These specifications require all filling shall be of earth or cinders and shall be deposited in layers of not more than 4 inches, then rolled; now, then, in view of these specifications, and your examination of this subgrade, do you mean to tell me, as a contractor, that that work is right, or has been done right?

"*A.* No, sir, it has not been done right.

"*Q.* In that particular this job from Mack to Gratiot is wrong, isn't it?

"*A.* Yes, sir. * * *

"*Q.* What you are testifying about, Mr. Chapoton, is

not that this is up to specifications, not that it is a good job in that particular, but that you could fix it?

"*A.* Yes, sir.

"*Q.* That is all you mean to say about it, but on the other hand, it is not up to specifications, nor is it a good job?

"*A.* No, not unless it was made so.

"*Q.* So that upon the Mack avenue job the subgrade is wrong, isn't it?

"*A.* Not all over; there is some places it is all right, but they are very few.

"*Q.* Very few places?

"*A.* Yes.

"*Q.* Where it is right? The curbstone, so far as the material itself is concerned, is good?

"*A.* Yes, sir.

"*Q.* But the concrete under it is not good—I mean, not a sufficient quantity of concrete?

"*A.* There is on the bottom, but not on the side.

"*Q.* Not on the side?

"*A.* No, sir.

"*Q.* You say that has to be torn out?

"*A.* Yes, sir.

"*Q.* So that in that particular this job is not right?

"*A.* No, sir.

"*Q.* That is about all that has been done, isn't it?

"*A.* Yes, sir.

"*Q.* So that aside from the Berea being good Berea, and the limestone being good limestone, that job is no good?

"*A.* It can be made good.

"*Q.* I mean as it is?

"*A.* No, no.

"*Q.* It is no good and it is not up to the specifications?

"*A.* No, sir."

There was testimony indicating that the commissioner was quite frequently over the work and it appears from the testimony of Benedict and Beyers that they were, not merely once in awhile but all the time, putting in less than the 8 inches of concrete required back of the curbing and less than 6 inches required by the specifications in front of the curbing, and it was a fair question whether the commissioner could have remained ignorant of these facts

unless he were more than ordinarily negligent. There are other matters also in the testimony as to which the jury might infer that a reasonable exercise of diligence would have informed the commissioner that matters were not going on properly with the work.

We do not deem it necessary to go further into detail in support of our view that there was competent evidence in support of the charges, particularly since the six learned judges of the Wayne circuit court have unanimously come to the same conclusion.

The 8th paragraph of the return of the common council is as follows:

"8th. We further certify and return that all the testimony and evidence taken on said hearing and at said trial of said charges cannot be returned for the reason that in addition to the witnesses being brought before the common council, and whose statements are contained in the stenographic record returned herewith as aforesaid, that in addition thereto, and as further testimony against said Robert E. Bolger, on Tuesday, the third day of April, 1906, the entire common council in a body visited all the different jobs of paving upon the Eastern and Western boulevards, the same being the paving jobs in controversy. That the said common council and the individual members thereof, having heard all the testimony, and being familiar with all the requirements, specifications and details of said work, carefully and personally examined into the same, their condition and the condition of each of said jobs, and into the matter of carrying out and executing said work, and took such measurements and depths as from time to time and place to place the said council saw fit. From such personal examination of the work and from such evidence as said council and the individual members thereof then and there saw, by being present and examining and viewing said work in detail, and which was apparent to said commissioner had he done his duty, the said common council was satisfied of the incompetency and unfitness of the said Robert E. Bolger, for his office as park and boulevard commissioner. That the said work was not up to the specifications, and said examination, with the other testimony in itself, sustained the charges that had been preferred against Robert

E. Bolger, and satisfied defendants in certiorari of his gross neglect of duty, unfitness and incompetency, maladministration, and unlawful conduct in his office of commissioner of parks and boulevards. That said inspection, as aforesaid, was made on three days' notice, and at said examination and inspection, as aforesaid, the said Robert E. Bolger was represented by one of his counsel, viz., Mr. Edwin Henderson, who accompanied the said common council in said inspection, as aforesaid; and that it appears from said testimony and said inspection that there was legal and competent evidence introduced upon the trial of said charges to support said charges and to warrant and justify the passage of the removal hereinbefore set forth."

It is contended by counsel for plaintiff that, it appearing from the return that the common council based its determination upon its own view, such fact annuls and vitiates its determination. As to this point and the further point, that the council should have voted separately on each charge and specification thereunder, and upon the question of removal, we quote with approval the language of the circuit bench as follows:

"3. The next point raised by the counsel for the plaintiff and most strenuously argued is, that the action of the council was based, not upon the testimony in the case, but upon a view of the alleged bad work by the council itself. This view was made by the council in a body in the presence of counsel for the plaintiff, and without objection on the part of either the plaintiff or his counsel. The examination was made after testimony had been taken by the council for many days, and it may well be supposed that it was necessary for a full understanding of the testimony, much of which appears to have been technical in its character. We quite agree with the contention of counsel for the plaintiff that the common council could not substitute information received by a personal view of the alleged faulty work for testimony with regard to the same, or use such information so received as a basis of action in the absence of all competent testimony tending to establish the charges. But it is not apparent to us from the record that this was done, and we are quite of the opinion that it was clearly within the rights of the

council to examine the work in order to have a better understanding of the testimony; and especially is this so when such examination was made in the presence of counsel for the plaintiff, and without objection from him. Emphasis is laid upon the remarks made by Alderman Heineman in explaining his vote. But it will be noted that he assigned his reasons for voting as he did, not alone to the effect of the view of the work upon his mind, but to the testimony regarding the same given before the council.

"4. Should the council have voted separately on each charge and specification thereunder, and upon the question of removal?

"The Supreme Court has said:

"'As the granting of a writ of certiorari is largely discretionary, we do not think it consistent with public policy to disturb the action of the bodies entrusted with managing local concerns, unless upon grounds which indicate probability that actual wrong has been done by the course taken. It is not intended by the law that such action shall be delayed by judicial interference where it can be avoided, and it is not the duty of such bodies to tie up their own hands by formalities which have no legal obligation.' *Gage* v. *Board of Sup'rs of Chippewa Co.*, 47 Mich. 170.

"Again:

"'While the proceeding for removal is quasi-judicial, and while it is well settled that the officer is entitled to notice of the charges, and that such charges must be sufficiently specific to apprise him of what he is to meet, yet the technical rules of pleading are not to be applied.' *Burt* v. *Board of Sup'rs of Iron Co.*, 108 Mich. 526.

"In the language of the resolution, the plaintiff is found guilty 'of the said several charges and specifications as aforesaid.' It must be presumed that each alderman who voted for the affirmative upon that resolution passed upon every one of the charges and specifications enumerated in the resolution, and upon the question of removal. It is obvious that those of the council who did not so determine voted in the negative, and there were ten of them."

The fact that the municipality was fully protected against financial loss by bonds; that the work had not been finally accepted by the commissioner; that the con-

tractors were bound to make good all defects in work or materials, and that the commissioner, according to his testimony, intended to make an accurate final inspection of the completed work and to require it to conform in all respects to the contract, would not be so inconsistent with the charges of gross negligence as to invalidate the findings of the common council.

It was the duty of the commissioner to inspect the work as it proceeded, which was obviously the most opportune time for inspection. The bonds and the provisions of the contract did not dispense with the necessity for careful supervision and inspection of the work as it proceeded, but furnished an additional remedy in case, with proper inspection during its progress, the improvement was found in any respect imperfect.

If, acting upon competent evidence, the common council were satisfied that the commissioner's performance of his duties evidenced such gross negligence as to indicate that his further continuance in office would be a menace to the public, his removal would not be improper for the reason that, in the end, the city would suffer no financial loss. Moreover, as said by the circuit bench:

"It is insisted that negligence within the true intent of the law touching the removal for cause means such negligence as imports actual loss to the public. It is not clear to the minds of the court, assuming the charges to have been sustained by competent testimony, that there is no loss to the public. Simply because the contractors in question had given bonds for the protection of the public against any money loss, it does not necessarily follow that no loss would have been suffered. The inconvenience of the public during the period when necessary repairs or rebuilding would have to be done, a period in which, had the contract been performed according to its tenor, the public would have been entitled to the free and unobstructed use of the roadway, is to our minds an element of loss quite as important and worthy of consideration as a mere financial loss."

With the strength or weakness of the case against Mr. Bolger we have nothing to do; our inquiry is limited to

ascertaining whether there was any competent evidence, however weak, tending to sustain the findings of the common council. We agree with the circuit bench that there was such evidence, and the judgment is affirmed.

MONTGOMERY, OSTRANDER, HOOKER, and MOORE, JJ., concurred.