### NATIONWIDE MUTUAL FIRE INSURANCE COMPANY v THE DETROIT EDISON COMPANY

Docket No. 78-3712. Submitted October 9, 1979, at Detroit.—Decided January 22, 1980. Leave to appeal denied, 409 Mich 854.

Nationwide Mutual Fire Insurance Company insured a warehouse owned by Thorman Industrial Park, Inc., and leased by The Detroit Edison Company. A lease executed by Thorman and Edison provided that the landlord waived all right to recovery by fire loss except as to such losses resulting from "wilful or gross neglect" on the part of tenant Edison. An Edison employee set fire to the warehouse while changing a muffler on an Edison truck. Eighty percent of the structure was destroyed. Nationwide paid Thorman for its loss, then, as subrogee of Thorman brought suit against Edison claiming gross neglect. At the conclusion of plaintiff's proofs, defendant's motion for a directed verdict was granted, Macomb Circuit Court, Raymond R. Cashen, J. The trial court held that the only valid interpretation that can be placed on the phrase "wilful or gross neglect" is a deliberate, concentrated effort on the part of the tenant to do some damage. Plaintiff appeals. *Held:*

The trial court definition of what constitutes gross neglect was improper. The term gross neglect, as used by the parties, intended some form of negligence greater than ordinary negligence but less than conduct bordering on deliberateness; therefore, when the parties employed the term gross neglect, they meant that defendant would be liable for failure to exercise the degree of care that even a careless individual would employ under the circumstances. Viewing the proofs in the light most favorable to plaintiff, as an appellate court is required to do in reviewing a motion for directed verdict, it appears that there is ample proof to warrant submission of the question of gross neglect to the jury. A jury question was raised as to whether multiple acts of negligence by defendant and employees, each

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur 2d, Contracts § 249.

[2] 57 Am Jur 2d, Negligence § 99.

[3] 75 Am Jur 2d, Trial §§ 482, 483.

of which had a cumulative effect, amounted to the commission of gross negligence. The trial court erred in removing this issue from the jury's consideration.

Reversed and remanded with instructions.

1. CONTRACTS — LEGAL TERMS — PRESUMPTIONS — INTENT OF PARTIES.

The parties to a written contract which uses terms having a definite legal meaning are presumed to have intended such terms to have their proper legal meaning, absent a contrary intention appearing in the instrument.

2. NEGLIGENCE — GROSS NEGLIGENCE — DEFINITION.

Gross negligence may be described as a failure to exercise that degree of care which even a careless individual would employ under given circumstances; gross neglect is some form of negligence greater than ordinary negligence but less than conduct bearing on deliberateness.

3. APPEAL AND ERROR — MOTIONS — DIRECTED VERDICT — TEST.

An appellate court, in reviewing a motion for a directed verdict, views the evidence in the light most favorable to the party opposing the motion, and if reasonable men could differ as to the meaning of the evidence a jury question arises and the motion should be denied.

*Denenberg, Tuffley, Thorpe, Bocan & Patrick* (by *John L. Hopkins*), for plaintiff.

*Jack M. Abella,* for defendant.

Before: J. H. GILLIS, P.J., and V. J. BRENNAN and MACKENZIE, JJ.

MACKENZIE, J. Plaintiff Nationwide Mutual Fire Insurance Company appeals as of right an August 28, 1978, judgment of the Macomb County Circuit Court, granting defendant Detroit Edison's motion for a directed verdict.

Plaintiff issued a three-year fire insurance policy on March 21, 1974, covering a warehouse located in Shelby Township, with liability limited to $75,-000. The named insured was the owner of the

property, Thorman Industrial Park, Inc.; however, the premises were leased by defendant. The lease was drafted by defendant, and contains the following pertinent provision:

"Landlord shall insure the demised premises against loss by fire and extended coverage perils. With respect to such losses, so insured, landlord waives all right of recovery from tenant, except as to such losses resulting from wilful or *gross neglect* on the part of tenants, agents, or employees * * *". (Emphasis supplied.)

On January 2, 1975, Daniel Walenty, an employee of the defendant who was a senior mechanic in charge of the garage, brought a Detroit Edison truck into the structure in order to repair the exhaust system. A fire ensued during the course of the repair work, resulting in destruction of 80% of the structure. Plaintiff paid the landlord, Thorman Industrial Park, Inc., for its loss and then, as subrogee, brought suit against defendant claiming "gross neglect". At the close of plaintiff's proofs, defendant moved for a directed verdict, which was granted by the trial judge.

As a general rule, where terms having a definite legal meaning are used in a written contract, the parties to the contract are presumed to have intended such terms to have their proper legal meaning, absent a contrary intention appearing in the instrument. 17 Am Jur 2d, Contracts, § 249, p 642. In ascertaining the proper legal meaning of the term "gross neglect", the trial court held that the only valid interpretation that can be placed on the phrase "wilful or gross neglect" is "a deliberate, concentrated effort on the part of the tenant to do some damage". The court referred to SJI 14.03, which deals with the terms gross negligence and wilful and wanton misconduct as used in the

now invalid automobile guest passenger statute, MCL 257.401; MSA 9.2101. According to SJI 14.03:

"The terms 'gross negligence or wilful and wanton misconduct' mean more than the failure to use ordinary care. These terms mean conduct which shows (actual or deliberate intention to harm) (or) (a reckless disregard for the safety of others in the face of circumstances involving a high degree of danger)."

After careful examination of Michigan case law, we disagree that this was the proper definition to employ.

The two definitional sources for the terms gross negligence and wilful and wanton misconduct are common law and cases interpreting the guest passenger statute. See *Thone v Nicholson,* 84 Mich App 538; 269 NW2d 665 (1978). For purposes of the guest passenger statute, the terms have been held by the Michigan Supreme Court to be synonymous. See *Thayer v Thayer,* 286 Mich 273, 276; 282 NW 145 (1938).

Unlike under the guest passenger statute, at common law the terms gross negligence and wilful and wanton misconduct are distinct concepts. *Thone v Nicholson, supra,* at 546. Gross negligence is synonymous with the last clear chance doctrine.[1] See *Zeni v Anderson,* 397 Mich 117; 243 NW2d 270 (1976). Wanton and wilful misconduct, however, involves a different type of conduct. At common law, it is "an intentional wrong or a reckless and heedless disregard to another's safety". *Papajesk v*

---

[1] But see *Bolger v Common Council of Detroit,* 153 Mich 540; 117 NW 171 (1908), which deals with the concept "gross neglect of duty". The term concerns the standard of duty owed by a public officer to the public. The Court stated that gross neglect of duty is not limited to intentional wrongdoing on the part of a public official, but also covers any neglect of official duty which permits the public welfare to be threatened or endangered. See also *Attorney General v Jochim,* 99 Mich 358; 58 NW 611 (1894).

*Chesapeake & Ohio R Co,* 14 Mich App 550, 555; 166 NW2d 46, 48 (1968).

The common-law definition of wilful and wanton misconduct is similar to the definition employed by the trial judge for gross neglect in the instant case. Adherence to the trial judge's definition would therefore result in equating wilful and wanton misconduct with gross negligence. Although this is what the Supreme Court did with the terms under the guest passenger statute, such equation is inappropriate here, as the concepts of gross negligence and wilful and wanton misconduct are distinct at common law. According to Prosser:

"Several courts * * * have construed gross negligence as requiring wilful misconduct, or recklessness, or such utter lack of all care as will be evidence of either— sometimes on the ground that this must necessarily have been the intent of the legislature. But it is still true that most courts consider that 'gross negligence' falls short of a reckless disregard of consequences, and differs from ordinary negligence only in degree, and not in kind. There is, in short, no generally accepted meaning; but the probability is, when the phrase is used, that it signifies more than ordinary inadvertence or inattention, but less than conscious indifference to consequences; and that it is, in other words, merely an extreme departure from the ordinary standard of care." Prosser, Torts (4th ed), § 34, pp 183-184.

Since we reject the interpretation of gross negligence as a deliberate intention to harm or a reckless disregard for another's safety, we are faced with the determination of the proper definition to employ. The common-law meaning of gross negligence in Michigan, the last clear chance doctrine, is clearly inapplicable to the instant case. In his discussion of gross negligence, Prosser points out that the concept of degrees of negligence has

come under much attack and has been rejected at common law by nearly all courts, except in bailment cases. To the extent that the term gross negligence does survive, however, it is often described as a "failure to exercise even that care which a careless person would use". Prosser, *supra*, at 183.

In the instant case, we believe that by the term "gross neglect", the parties intended some form of negligence greater than ordinary negligence, but less than conduct bordering on deliberateness. Therefore, we conclude that for purposes of this lease, when the parties employed the term "gross neglect", they meant that defendant would be liable for failure to exercise the degree of care that even a careless individual would employ under the circumstances.

Turning to the facts, we note that on the night of the fire the outside temperature was below freezing. Walenty expected expansion of the gasoline in the fuel tank of the truck as a result of being brought into a warm garage. Accordingly, Walenty siphoned off approximately five gallons of gasoline from the fuel tank and directed it into a storage container which was placed on the driver's side of the truck.

Walenty then raised the truck on jacks, checked for gasoline expansion or leaking and, finding none, began removing the exhaust system with an oxygen acetylene torch. Using the torch, Walenty cut through one of the muffler clamps which held the muffler to the exhaust pipe. Sparks resulted. Upon finishing his first cut, Walenty noticed a fire at his feet. He came out from under the truck, obtained a water-filled $CO_2$ charged extinguisher from his welding cart and applied it to the floor. His efforts were unsuccessful, however, as the fire

was not only on the floor but also around the gas tank filler neck. Walenty then attempted to use a $CO_2$ charged chemical-type extinguisher mounted on one wall of the garage; however, this extinguisher proved to be inoperable.

Walenty then heard an explosion, following which he raised both overhead roll-up bay doors in the hope of venting the gases from the fire. This action, however, provided additional oxygen to feed the fire. Walenty then ran for safety to another building, where he called the Shelby Township Fire Department. By the time the fire was contained, 80% of the structure was destroyed.

Additional testimony established that defendant's own safety regulations required placing a 20-lb. field-type chemical fire extinguisher within easy reach of the welding job prior to commencing. Walenty admitted he failed to do so, having available instead the smaller, water-based extinguisher. Walenty also violated company regulations by failing to properly inspect and clean up flammable substances before using a welding torch, by failing to cover the gas tank with an asbestos blanket, and by failing to clear the area of all fire hazards before using any kind of welding apparatus.

It was further established that responsibility for the maintenance, inspection, and reporting of fire extinguishers was a responsibility of defendant's employees according to defendant's own regulations, which required annual inspections by the crane and elevator division, monthly inspections by the warehouseman or leader as required by the Occupational Safety and Health Act, MCL 408.1001 *et seq.;* MSA 17.50(1) *et seq.* and frequent inspections by supervisors, garage foremen, warehousemen, and senior district mechanics. All such employees were required to report any defect or

malfunction and to follow up with appropriate repairs or replacement.

Viewing the proofs in the light most favorable to plaintiff, as is required in a motion for directed verdict, there is ample proof to warrant submission of the question of "gross neglect" to the jury. A jury question was raised as to whether multiple acts of negligence, each of which had a cumulative effect, amounted to the commission of gross negligence. See 57 Am Jur 2d, Negligence, § 104, p 455. We therefore hold that the trial court erred in removing this issue from the jury's consideration.

Finally, we conclude that the trial judge erred in preventing plaintiff from introducing evidence as to defendant's possible violation of the Shelby Township Fire Code concerning the use of a welding torch. On remand, the court is directed to permit plaintiff to present proof of the ordinance and its alleged violation by defendant. See MRE 202.

Reversed and remanded. Costs to plaintiff-appellant.

V. J. BRENNAN, J., did not participate in this decision.