NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0593n.06
Filed: July 13, 2005

No. 04-1489

## UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

ROSALIND ASHFORD HOLMES and
ANNETTE BEARD STERLING,

     Plaintiffs-Appellants,

v.

ARTISTS RIGHTS ENFORCEMENT CORP.
(AREC), CHARLES RUBIN, SUMMIT,
ROVINS & FELDESMAN and IRA
GREENBERG

     Defendants-Appellees,

v.

UMG RECORDINGS, INC.

     Defendant/Third Party-Plaintiff-Appellee

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

---

Before:      MARTIN and ROGERS, Circuit Judges; McKINLEY, District Judge.[*]

     JOSEPH H. McKINLEY, JR., District Judge.  Rosalind Ashford Holmes and Annette Beard

Sterling appeal the district court's grant of summary judgment in favor of Defendants, Artists Rights

Enforcement Corporation; its President, Charles Rubin; the law firm of Summit, Rovins &

Feldesman; and one of its attorneys, Ira Greenberg.  Holmes and Sterling claim that the district court

---

     [*]The Honorable Joseph H. McKinley, Jr., United States District Judge for the Western
District of Kentucky, sitting by designation.

erred in its interpretation of the contracts between them and Artists Rights Enforcement Corporation.

Holmes and Sterling also claim that the district court abused its discretion in denying their Motion

to Reconsider both the grant of summary judgment as to Artists Rights Enforcement Corporation

as well as the Court's award of attorneys' fees to UMG Recordings, Inc. For the following reasons,

we **AFFIRM** the judgment of the district court.

## I.

The Appellants, Rosalind Holmes and Annette Beard Sterling, are original members of the

Motown Records group Martha and the Vandellas. Martha and the Vandellas, inductees into the

Rock and Roll Hall of Fame, recorded a number of hits in the 1960s, such as "Heat Wave" and

"Dancing in the Street." Despite their success, the two members of the Vandellas who bring this

action had difficulty obtaining royalty payments allegedly owed to them by Motown Records. In

1984, Holmes and Sterling (collectively the "Vandellas") entered into two separate contracts with

Artists Rights Enforcement Corporation ("AREC") under which AREC and its president, Defendant

Charles Rubin, agreed to collect the Vandellas' royalties. The contracts, which were identical,

provided in pertinent part:

> I hereby retain you and your firm to act on my behalf in connection with investigation and collection of any and all royalties which are, or may be due and owing to MARTHA AND THE VANDELLAS...
>
> It is my further understanding that in the event it is desirable or necessary to engage counsel to act on my behalf, that you shall recommend counsel who is satisfactory to me that I shall retain upon such terms as may be agreeable between us and such counsel shall be paid out of your share of the proceeds realized, and in accord with my separate agreement with such counsel.
>
> In return for your services set forth hereinabove, I shall pay you fifty (50%) percent of all sums which may come into your hands or which may be realized as a

proximate result of your activities on my behalf...

Further, I hereby authorize you to receive all funds collected by you hereunder and appoint you my attorney in fact but only for the purpose of depositing them into your special account. Upon the clearing of such funds, you shall then make payment to me, yourself and any third parties including attorneys under the terms of this agreement.

Several years later, Rubin suggested and the Vandellas agreed to hire the law firm of Summit, Rovins & Feldesman ("Summit Rovins") to pursue a case against Motown. Ms. Sterling's retainer agreement[1] provided as follows:

For our services, we shall be entitled to receive 33-1/3% of all monies payable to or received by Ms. Sterling on account of sums found due to the date of judgment and, in addition, 25% of all monies due to or received by Ms. Sterling from Motown thereafter....You [AREC] understand that Ms. Sterling and her co-plaintiffs are the clients and that, in case of conflicting advice, we are obliged to follow that received from Ms. Sterling and her co-plaintiffs.

Summit Rovins pursued a case against Motown in Michigan which eventually settled in 1989. In 1992, the lead attorney in that case, Ira Greenberg, left Summit Rovins, which subsequently dissolved, to join the law firm of Edwards & Angell. Summit Rovins assigned the benefit of the retainer agreement with the Vandellas to Edwards & Angell. In 1994, apparently because Motown was again not paying sufficient royalties, Edwards & Angell commenced a new action against Motown in California. That lawsuit also settled.

As a result of the lawsuits, the Vandellas received royalties from Motown and still receive royalties from Motown's successor in interest, UMG Recordings, Inc. ("UMG"). As recently as 2003, UMG made payments to AREC, which, in turn, was retaining its share and paying the

---

[1]While only Sterling's retainer agreement appears in the Joint Appendix, no party suggests that Holmes' agreement was any different.

remainder to Edwards & Angell. In 2003, the Vandellas attempted to terminate their contracts with

AREC on the theory that AREC had not done any new work and should not be entitled to continuing

payments. To that effect, the Vandellas corresponded with UMG, asking them to make royalty

payments to them only. Upon learning of this, Greenberg sent a letter to UMG on behalf of AREC

asking UMG to either continue paying AREC or place the funds in escrow pending judicial

resolution.

On March 31, 2003, the Vandellas brought suit against AREC, Rubin, Summit Rovins, and

Greenberg in Michigan state court. The case was removed to federal court on April 23, 2003, on

the basis of diversity jurisdiction. The Vandellas alleged that the contracts with AREC, as "forever

contracts," were terminable at will, that the Defendants had been overpaid, that the contracts were

unconscionable, and that the Defendants breached their fiduciary duties. The Vandellas also charged

unjust enrichment and constructive trust. The parties filed cross-motions for summary judgment,

and on March 3, 2004, the district court granted the Defendants' motions for summary judgment.

The district court held that the provision of contract with AREC providing that AREC would

receive "fifty (50%) percent of all sums which may come into [AREC's] hands or which may be

realized as a proximate result of [AREC's] activities on [the Vandellas'] behalf" was not ambiguous.

The court held that the provision entitled AREC to 50% of

> "*all* sums" realized by Plaintiffs, with only one limitation—the sums must be
> realized as a "proximate result" of Defendants efforts. Under this term, the 50%
> royalty fees could continue even after Plaintiffs terminate the contract, so long as the
> payment of the royalties is proximately caused by Defendants efforts.

Because the Vandellas offered no evidence of any other intervening cause that brought about the

royalty payments, the district court concluded that the royalty payments were proximately caused

by AREC. The Vandellas appeal the district court's grant of summary judgment.[2]

The Vandellas also appeal the district court's decision in a consolidated interpleader matter. As discussed above, after the Vandellas had directed UMG to make royalty payments to them only, AREC wrote to UMG and attempted to force UMG to continue making royalty payments to AREC. On March 26, 2003, UMG told AREC that it would account to the Vandellas directly. UMG, however, did not in fact forward the payments to the Vandellas. On March 28, 2003, AREC filed suit against UMG and the Vandellas in New York Supreme Court seeking to force UMG to pay AREC the Vandellas' royalties. On April 24, 2003, AREC voluntarily dismissed the action. Meanwhile, the Vandellas continued to ask UMG to send any royalties only to them. Throughout this period, UMG remained non-committal. On May 27, 2004, the Vandellas sued UMG in Michigan state court, alleging breach of fiduciary duties and unjust enrichment. UMG removed the case to federal court, and on June 10, 2003, sent a letter to the Vandellas informing them that if they did not voluntarily dismiss the case against UMG with prejudice, UMG would be forced to file a counterclaim for interpleader. In exchange for the Vandellas' voluntary dismissal, UMG offered to deposit the royalties in a court-maintained trust account. On June 12, 2003, UMG sent another letter to the Vandellas indicating that UMG's "policy is that it will not pay in these sorts of situations, where two parties are claiming the right to the same funds." After the Vandellas refused

---

[2]The district court made a number of rulings with respect to whether AREC, Rubin, Greenberg, and Summit Rovins were proper defendants. Because the Vandellas' agreement with AREC also explicitly included Rubin as a contracting party, the district court held that Rubin was a proper defendant. The district court held that Greenberg and Summit Rovins, however, were not proper defendants as to the count of overpayment of royalties. Although the Vandellas argue in their brief that the "AREC defendants" were overpaid—a group that includes Greenberg and Summit Rovins—the Vandellas do not appear to argue that the holding that Greenberg and Summit Rovins were not proper defendants was in error. Thus, the Court understands the appeal to argue only that AREC and Rubin were overpaid.

to stipulate to a compromise, UMG filed a counterclaim/third party complaint for interpleader, disowning an interest in the royalty payments, and seeking a declaration of the rights of the parties claiming an interest in the royalty payments. On July 11, 2003, the Vandellas' action against UMG was consolidated with the Vandellas' action against AREC and the other defendants.

On August 8, 2003, the parties agreed that UMG should be dismissed from the action and should make all royalty payments to AREC, who agreed to pay 50% of the royalties directly to the Vandellas, while placing the remaining 50% into an escrow account. On August 6, 2003, UMG filed a motion seeking attorneys' fees and costs in the amount of $25,567.45. The district court, on January 15, 2004, granted UMG's motion, and concluded that the Vandellas alone were responsible for UMG's fees. The district court justified its decision on the theory that "even before litigation commenced in this case, AREC agreed with and advocated that UMG place all disputed funds into an escrow account." The Vandellas filed motions for reconsideration as to both the grant of summary judgment for AREC and as to the award of attorneys' fees and costs to UMG. Both motions were denied by the district court, and the Vandellas appeal those decisions. UMG filed with this court a motion to dismiss the appeal against it for lack of appellate jurisdiction. On December 15, 2004, the motions panel denied the motion, holding that the notice of appeal was timely and effectively appealed the order awarding fees and costs to UMG.

II.

This court reviews a grant of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving party. *Boone v. Spurgess*, 385 F.3d 923, 927 (6th Cir. 2004). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The typical standard of review for the denial of a motion to reconsider is the "abuse of discretion" standard, "but where reconsideration of summary judgment was sought, . . . a de novo review" is appropriate. *Sommer v. Davis*, 317 F.3d 686, 691 (6th Cir. 2003). In interpleader actions, the award of costs and attorneys fees is within the sound discretion of the court, and an award should not be reversed unless the district court abused that discretion. 4 Moore's Federal Practice § 22.06.

In this appeal, the Vandellas challenge the district court's finding that their contracts with AREC were not ambiguous with respect to the term providing that AREC would receive 50% of all sums "which may be realized as a proximate result of [AREC's] activities on [the Vandellas'] behalf." Relatedly, the Vandellas contend that the district court erred in its interpretation of the phrase "proximate result." The Vandellas also argue that the district court abused its discretion in awarding UMG all of its attorneys' fees and costs associated with the interpleader action.

The interpretation of these contracts is governed by Michigan law. "The initial question whether contract language is ambiguous is a question of law. If the contract language is clear and unambiguous, its meaning is a question of law. Where the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact." *Port Huron Educ. Assoc. v. Port Huron Area Sch. Dist.*, 550 N.W.2d 228, 237 (Mich. 1996) (internal citation omitted). A contract is ambiguous "when its provisions are capable of conflicting interpretations." *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003). Though a term may be undefined, Michigan law does not consider such term ambiguous automatically. *Terrien v. Zwit*,

648 N.W.2d 602, 613 (Mich. 2002). If a term is not defined in a contract, courts will interpret such term in accordance with its commonly used meaning. *Id.* However, "where terms having a definite legal meaning are used in a written contract, the parties to the contract are presumed to have intended such terms to have their proper legal meaning, absent a contrary intention appearing in the instrument." *Nationwide Insurance v. Detroit Edison*, 289 N.W.2d 879, 881 (Mich. App. 1980).

Since the term "proximate result" is not defined in the contracts, the Vandellas contend that the plain meaning of the term must be used. They urge us to adopt the Random House Dictionary definition of each word, which they argue supports the following conclusion:

> The word 'proximate' ordinarily means being 'next, nearest, immediately before or after in order, place or occurrence, close or ver near.' Result is defined as 'to spring from, arise or proceeds as a consequence from the actions, circumstances or premises. The logical meaning of 'proximate result' when applied under these circumstances is that Defendants are entitled to 50% of the royalties collected close or very soon after their royalty collection based activities.

The Vandellas argue that a triable issue exists due to the mere passage of time since AREC's last "royalty collection based activity." We disagree. We do not find the term "proximate result" to be ambiguous when it is given its definite legal meaning.

We find no error in the district court's application of the "proximate cause" standard in tort claims to this contact claim. The Michigan Supreme Court has defined the proximate cause of an injury to be " that which in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, without which such injury would not have occurred." *Weissert v. City of Escanaba*, 299 N.W. 139, 143 (Mich. 1941) (internal quotation omitted); *see also Gantt v. Mobil Chem. Co.*, 463 F.2d 691, 700 (5th Cir. 1972) (noting that "proximate cause" has a well-settled and long-established legal meaning). The definition of "proximate cause" is remarkably similar to the

definition of "proximate result" as set forth by the Montana Supreme Court in *Harri v. Isaac*, 111

Mont. 107 P.2d 137, 141 (Mont. 1940), which found that term to mean "a result that would naturally

and ordinarily follow from the alleged act complained of, unbroken by any new and independent

cause." In so finding, the court noted that the term "proximate" means the same in the term

"proximate result" as in the term "proximate cause." *Id.* Similarly, BLACK'S LAW DICTIONARY

1226 (6th ed. 1990) sets forth the following as one of its definitions for "proximate consequence or

result:" "One ordinarily following from the negligence complained of, unbroken by any independent

cause, which might have been reasonably foreseen."

There is no contrary intention to be found in these contracts; thus, it is presumed that the

parties intended the term "proximate result" to be given its proper legal meaning. In the context of

these contracts, the term "proximate result" means that there must be a causal link between the

efforts of AREC and the receipt of royalties by the Vandellas, unbroken by any other cause, in order

for AREC to be entitled to remuneration. The Vandellas are currently receiving payments from

UMG for only one reason–the efforts of AREC. AREC's efforts are thus the "proximate result" of

the Vandellas current receipt of royalties. The evidence does not even remotely suggest another

cause. Because the causal chain remains unbroken, the passage of time is irrelevant.

The Vandellas point to a footnote in the district court's opinion to support its argument that

the passage of time is sufficient to break the causal chain. In footnote 10, the district court stated,

> Plaintiffs may seek to argue again at some time in the future that the passage of time
> has finally been enough to permit a reasonable jury to find that AREC's efforts
> should no longer be considered the proximate cause of all or part of Plaintiffs'
> royalty payments. Although unconvinced by such an argument at this time, the court
> expresses no view as to the propriety or persuasiveness of such an argument if made
> in the future.

Contrary to the Vandellas' assertions, the district court did not conclude that the mere passage of time would be sufficient to break the causal chain. Instead, the district court expressed no view as to the propriety of such an argument. However, in the body of the opinion itself, the district court stated, "[i]n the future, it is conceivable that Plaintiffs may be able to point to facts not yet in existence that may show that some or all of the royalty payments resulted from circumstances or actions outside of AREC's efforts, and argue that such circumstances or actions constitute a separate or intervening proximate cause of such royalties." The district court's opinion is thus entirely consistent with our interpretation of the legal phrase "proximate result." Since the Vandellas failed to present any other cause for the receipt of the royalties, we find that the district court properly resolved this issue as a matter of law.

Lastly, the Vandellas object to the district court's award of attorneys' fees and costs to UMG. The district court found an award of attorneys' fees and costs for all of UMG's expenses to be appropriate because the Vandellas consistently rebuffed UMG's attempts to place the disputed funds in an escrow account. In so holding, the district court noted its discretion to award attorneys' fees and costs in both an interpleader action, as well as under 28 U.S.C. § 1927. The Vandellas argue that the district court abused its discretion because the interpleader action did not promote efficiency, UMG was not innocent of provoking the dispute, the fees were not minor in relation to the fund nor were they reasonable, and AREC should be forced to bear some of the attorneys' fees and costs as well.

"Neither Rule 22 nor the interpleader statute contains an express reference to costs or attorney's fees." 7 Wright, Miller & Kane, Federal Practice and Procedure: Civil § 1719 (3d ed.

2001). Nevertheless, "[a] federal court has discretion to award costs and counsel fees to the stakeholder in an interpleader action, whether brought under Rule 22 or the interpleader statute, whenever it is fair and equitable to do so. *Id*. An interpleading party is entitled to recover costs and attorney's fees when it is (1) a disinterested stakeholder, (2) who has conceded liability, (3) has deposited the disputed funds into court, and (4) has sought a discharge from liability. *Septembertide Publishing v. Stein and Day*, 884 F.2d 675 (2d Cir. 1989). The only limiting principle is reasonableness, and it is at the discretion of the Court to determine what award is appropriate. 7 Wright, Miller & Kane, supra, § 1719.

In this case, UMG was a disinterested stakeholder that conceded liability, offered to deposit the funds into court, and sought discharge. UMG warned the Vandellas it would seek attorneys' fees and costs if forced to file an interpleader action. In a letter from UMG counsel Daniel D. Quick to Gregory Reed, counsel for the Vandellas, Quick wrote,

> Before Universal [UMG] is forced to incur additional attorney fees to address your lawsuit, I am asking you to voluntarily dismiss your litigation against Universal, with prejudice. In exchange, Universal (through the proper entity) will agree to pay the subject royalties into a court-maintained trust account, to be released only upon order of the Court or settlement between your clients and AREC. You have until noon, June 11, to accept this option. If you do not concur, please be advised that Universal will move to consolidate both lawsuits before Judge Cleland, and file a counter-claim and third-party complaint for interpleader, after which Universal shall be entitled to recover its actual attorney fees from your clients.

Unfortunately, despite the warning, the Vandellas chose to proceed and now face the consequences of that choice. UMG had no choice. It was forced to incur attorneys' fees and costs in order to extricate itself from the litigation. We find no abuse of discretion by the district court in assessing all the attorneys' fees and costs to the Vandellas under these circumstances.

## III.

For the foregoing reasons, we **AFFIRM** the decision of the district court.