James H. SIMONDS, DPM, and James H. Simonds, DPM, PC, Plaintiffs,

v.

BLUE CROSS–BLUE SHIELD OF MICHIGAN and United States of America, Defendants.

No. K82–32 CA.

United States District Court, W.D. Michigan, S.D.

Feb. 20, 1986.

William A. Redmond, Deming, Hughey, Keiser, Allen & Chapman, Kalamazoo, Mich., for plaintiffs.

John A. Smietanka, U.S. Atty. by Jeanine Laville, Asst. U.S. Atty., Grand Rapids, Mich. (Donna Morros Weinstein, Regional Atty., James R. Goeser, Asst. Regional

Atty., Chicago, Ill., of counsel), for defendant U.S.A.

Ralph D. Gilpin, Detroit, Mich., for defendant Blue Cross-Blue Shield of Mich.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BENJAMIN F. GIBSON, District Judge.

In this action, Dr. James H. Simonds, a podiatrist, alleges that defendants Blue Cross-Blue Shield of Michigan and the United States of America defamed him by sending letters to fourteen of his patients, indicating that he had been suspended from the Medicare program due to a criminal conviction. In fact, Dr. Simonds had not been convicted of any crime and the letters were erroneously sent. The case was tried to the Court during four days in December of 1985. The parties have submitted post-trial briefs.

### I. FINDINGS OF FACT

The following constitute the Court's general findings of fact. More specific findings of fact relevant to particular legal issues are incorporated in the Court's discussion of its conclusions of law.

#### A. *Parties*

Plaintiff, James H. Simonds, D.P.M., is and at all times pertinent to this litigation was a duly licensed podiatrist and surgeon in the State of Michigan. Plaintiff James H. Simonds, D.P.M., P.C., is a professional corporation with its principal place of business located at 126 East Kilgore, in the City of Portage, Michigan.

Prior to January 14, 1986, Dr. Simonds had a good name and reputation in his local area and in the podiatric community at large. He had been actively practicing podiatric medicine in the Kalamazoo area for twenty-five years and had built up a prosperous practice. He was involved in numerous civic, church and professional activities. In 1971, he was appointed by the Governor of Michigan to serve on the po-

diatric board of the Michigan Department of Licensing and Regulation. He also served for eleven years on the Board of Trustees of Scholl College in Chicago, a school of podiatry. Several character witnesses testified that Dr. Simonds had a reputation for truth, honesty, and integrity in his profession and in the community.

Defendant Blue Cross-Blue Shield of Michigan (Blue Cross) is a statutorily created hospital-medical corporation which is a designated carrier for Medicare Part B claims in the State of Michigan.[1] It has assumed this role by contract with the United States Department of Health and Human Services. Defendant United States was named as a party because of its involvement in this action through the Department of Health and Human Services.

#### B. *Background Dispute*

Testimony at trial established that, for a period of approximately 20 years before the incident that precipitated this suit, Dr. Simonds had been involved in some minor disagreements with Blue Cross. Although these disagreements are not directly relevant to the alleged defamation that is the subject of this action, they shed light on Dr. Simonds' frame of mind and are, in that way, relevant.

Dr. Simonds testified to a number of incidents that led him to believe that Blue Cross discriminated against podiatrists. For example, he testified that, prior to 1964, Blue Cross arbitrarily determined the amount of payment it would make for podiatrists' services. He further testified that, in 1964, Blue Cross sent a letter to hospitals informing them that they could not be a Blue Cross participating hospital if they had podiatrists on staff. In 1964 and 1965, new legislation was passed in Michigan providing for more favorable treatment of podiatrists by Blue Cross. Dr. Simonds was one of the principal authors of that legislation. Dr. Simonds testified that, even after the new legislation took effect,

---

**1.** Part B claims are those dealing with services of physicians and other providers. Part A claims deal with the services of hospitals and other facilities.

Blue Cross continued to discriminate against podiatrists. In 1967 and 1968, it cut benefits on several of the specific kinds of surgery podiatrists perform. Later, Blue Cross refused to reimburse for certain kinds of services when they were performed by podiatrists but would pay if those same services were performed by a M.D. or a D.O.

Dr. Simonds testified that, in addition to his belief that Blue Cross discriminated against podiatrists in general, he also believed they discriminated against him in particular. He testified that, when Blue Cross was chosen to administer a H.M.O. program for General Motors, it specifically told G.M. that Dr. Simonds could not be a participating physician. He testified that Blue Cross had sometimes sent to his patients claims forms that he never submitted, thus making it appear that he submitted false forms. He further testified that Blue Cross had sent forms to the IRS showing payments to Dr. Simonds that were thousands of dollars higher than the actual payments it had made. Although the Court has made no conclusion regarding the accuracy of the substance of this testimony, the Court does conclude that Dr. Simonds honestly *believed* that Blue Cross had discriminated against podiatrists in general and against him in particular.

In 1980, a dispute arose between Dr. Simonds and Blue Cross that ultimately triggered the incident at issue in this suit. Dr. Simonds treated a patient named Mildred Brisbane and, in addition to accepting an assignment of her Medicare claims, charged her $786.13. Blue Cross took the position that the assignment contract which Dr. Simonds signed, permitting him to bill Medicare directly, required that he accept the reimbursement of the Medicare carrier as reimbursement in full. Thus, according to Blue Cross, Dr. Simonds was not permitted to charge Brisbane the additional $786.13. Dr. Simonds took the position that the additional services he performed for Brisbane were noncovered services and that he, therefore, was entitled to charge her $786.13 for them.

The Health Care Financing Administration (HCFA) in Chicago, the branch of the U.S. Department of Health and Human Services that deals with Medicare, determined that Dr. Simonds had violated the terms of his assignment contract. Richard Levenson, an auditor for HCFA's Office of Program Integrity, sent a letter on September 18, 1980, directing Velma Glass, Manager of Blue Cross's Medicare Surveillance Department in Detroit, Michigan, to contact Dr. Simonds and request a $786.13 refund for Brisbane. That letter, in relevant part, reads as follows:

... There has been an assignment violation and Dr. Simonds must make a refund or have assigned claim payments made to the beneficiaries.

Please contact Dr. Simonds and request a $786.13 refund for Ms. Brisbane. Advise him that if this payment is not made within ten days, you will discontinue honoring all assigned claims that he submits. This would include Title XVIII cases which may result in a subsequent Title XIX payment. All future assigned claims would be processed for payment to the beneficiary per Section 11027 of the Part B Carrier's Manual.

Please advise me of the result of your contact with Dr. Simonds.

If you have any questions, please call me ...

On October 24, 1980, Edith Fields, an Internal Analyst in Blue Cross's Medicare Surveillance Department, sent a letter to Dr. Simonds. She explained that, if he did not refund the money within ten days, Blue Cross would discontinue honoring any assigned Medicare claims he submitted. On November 1, 1980, a second letter was sent from Fields to Simonds, advising him that, as of that date, he was suspended from the assignment program.

Also on November 10, 1980, Edith Fields sent an internal memorandum to Clara Thompson at Blue Cross. That memo, in its entirety, reads as follows:

RE: James Simonds, D.P.M.
126 E. Kilgore Rd.
Kalamazoo, MI. 49001

Provider # : 5-39-5162

We have been instructed by SSA Regional Office to suspend all direct Medicare payments to the above Medicare provider. This suspension is to take effect November 10, 1980 and is a result of the provider's violation of the Medicare Assignment Agreement. Please initiate the proper procedures.

## C. Suspension of Physicians under the Medicare Program

In the September 18 letter quoted above, Richard Levenson of HCFA advised Velma Glass of Blue Cross that any assigned claims filed by Dr. Simonds were to be processed according to Section 11027 of the Medicare Part B Carrier's Manual. Section 11027 of the Part B manual, a manual which explains Medicare procedures for the benefit of carriers like Blue Cross, is entitled "Physician or other Supplier Breaches Assignment Agreement." The section explains that, if a physician fails to refund monies incorrectly collected after he is notified of the impropriety of the charges, the carrier may revoke the physician's right to receive assigned benefits. Witnesses at trial explained that this meant that the Medicare carrier would continue to pay claims submitted by the patients themselves but would not honor any claims submitted directly by the physician. That is, the carrier would not honor any *assigned* claims.

The testimony at trial established that, in addition to the provision for a revocation of physician's assignment privileges under section 11027 of the Part B manual, the manual provides for another, different kind of suspension. Section 11034 of the manual provides the procedures to be followed when a physician is suspended because of a criminal conviction related to his or her involvement in the Medicare or Medicaid programs. This section is entitled "Suspension of Convicted Physicians or Other Individual Practitioners." When a physician is suspended under section 11034, the carrier will not pay claims for services rendered by the suspended physician, whether those claims are submitted by the physician or by the patient. The Part B manual contains an example of a form letter to be used in the case of a suspension under section 11034. The testimony at trial clearly established that an assignment violator under section 11027 is very different from a suspended provider under section 11034.

## D. Allegedly Defamatory Letters

On January 14, 1981, in response to claims submitted for payment, Blue Cross sent twenty-one letters that read, in part:

This is to inform you that reimbursement for all services rendered by James Simonds, D.P.M. will be denied under the Medicare Program (Title XVIII of the Social Security Act). Action is being taken because of Dr. Simonds conviction of a criminal offense related to his participation in the Medicaid (Title XIX) program.

Due to this suspension, we will no longer pay for any items or services furnished by Dr. Simonds beginning the 15th day from date on this notice.

Plaintiffs submitted into evidence copies of the letter addressed to fourteen different individuals. The parties stipulated that those individuals did in fact receive the letters.[2] Of the fourteen, only one, Ann Snyder, was a patient from whom Dr. Simonds had accepted an assignment of Medicare claims. The others were billed directly by Dr. Simonds and then submitted their own claims to Blue Cross, the Medicare carrier.

There is no question but that this letter was erroneously sent. The September 18 letter from HCFA advised Blue Cross that, if Dr. Simonds did not refund the Brisbane money, Blue Cross was to process his

---

**2.** There was testimony that one individual to whom the letter was sent, Gladys Decker, was not even a patient of Dr. Simonds. There is no evidence, however, that Decker received the defamatory letter. There are 14 letters in evidence. None is addressed to a Gladys Decker. Accordingly, the Court has ignored the significance, if any, of the testimony regarding the sending of a letter to Decker.

claims pursuant to *section 11027* of the Part B manual, the section dealing with assignment violators. Instead, the letters were sent out according to the provisions of *section 11034* of the manual, the section dealing with providers who have been suspended because of a conviction of a crime relating to participation in the Medicare and Medicaid programs. In the letter, Blue Cross referred to Dr. Simonds as someone who had been convicted of a crime. In fact, the testimony at trial established that Dr. Simonds has never been convicted of any crime. Further, the letter indicates that patients could no longer be reimbursed for services provided by Dr. Simonds. If Blue Cross had correctly treated Dr. Simonds as an assignment violator under section 11027, it would only have revoked his right to take assignments, not the patients' rights to be reimbursed for services provided by him.

Although all witnesses agreed that the wrong letter had been sent out, the testimony is less clear regarding how it happened. From the testimony, however, the Court is able to piece together the following chronology.

As has been explained above, the series of events began when HCFA, the governmental agency, sent the letter to Velma Glass of Blue Cross, directing her to institute the procedures under section 11027 of the Part B manual. Also as described above, Edith Fields, from Velma Glass's department, sent a memorandum to a Clara Thompson at Blue Cross, instructing her to initiate the appropriate procedures. A copy of that memo was sent to Josephine Kreager, a Blue Cross supervisor who dealt with the processing of claims.

The memorandum from Edith Fields triggered a response in Blue Cross's data handling system. Janet Reinhard testified that, in response to such memos, the computer processors in the Prepayment Utilization review department would submit input slips to the systems computer department. That department would then program the computer to edit out any claims submitted for services of the named physician. Rein-

hard testified that she had the responsibility of maintaining ongoing lists of Suspended Providers and Assignment Violators. These lists were used to direct the claims processors in handling the claims that had been rejected by the computer. Reinhard testified that, when she reviewed the Fields memorandum, she determined that Dr. Simonds should be identified in the system as an assignment violator. Thus, she added his name to that list. She also testified, however, that she considered the Fields memorandum to be ambiguous and that she could understand how someone could have misinterpreted it if they had not read it carefully.

Roberta Black, an Aged Claims Processor in the Prepayment Utilization Review Department, also testified. She explained that she was responsible, in part, for handling claims that had been edited out of the ordinary stream of processing. She testified that claims that are edited out under Review Code 15, as were the claims regarding Dr. Simonds, require a surveillance edit for one of three reasons: 1) the doctor is under surveillance, 2) the doctor is a suspended provider, or 3) the doctor is an assignment violator. Black's job required her to sort the claims according to the provider code that identified the physician and then refer to memorandums concerning those particular physicians. She explained that, when she received the claims for services performed by Dr. Simonds, she found no memorandum advising her how to handle his claims. Accordingly, she went to Josephine Kreager, her supervisor, for direction and left the claims with her. Black testified that she did not see the Simonds claims again until they came back to her signed and ready to be mailed. She testified that she was certain they had in fact been signed because she would not have sent them out if they were not; it was part of the procedure that the letters had to be signed. Black did not read the letters before sending them out; thus, she did not know they said that Dr. Simonds had been convicted of a crime.

Josephine Kreager, who was the supervisor of both Janet Reinhard and Roberta Black, also testified. She explained that, when the matter was brought to her attention, she conferred with both Black and Reinhard regarding how the Fields memorandum should be interpreted. Kreager determined that a "suspended provider" form letter was appropriate. Accordingly, she went to the file, pulled a "suspension" letter, and asked Reinhard to type the twenty-one versions of the form letter.

The Court finds the testimony of Kreager and Reinhard somewhat contradictory on this matter. As described above, Reinhard testified that, in her capacity as a Senior Processor in the Prepayment Utilization Review Department, she read Field's memorandum and correctly identified Dr. Simonds as an assignment violator. However, when Kreager consulted with her and asked her to type the letters, she did not even question whether Simonds was in fact a "suspended provider." By way of explanation, Reinhard stated that it was her job to type without typographical errors, not to confirm the accuracy of the contents of the letters she was typing. Even accepting that as true, the Court cannot reconcile Kreager's testimony with that of Reinhard. Kreager testified that she conferred with Reinhard regarding the proper interpretation of the Fields' memorandum. Yet, Reinhard testified that she had independently determined that the memorandum identified Simonds as an assignment violator. If Reinhard made that determination independently, why would she not have advised Kreager to that effect when consulted? Although the Court cannot determine from this testimony exactly what happened, it can narrow it to two possibilities: 1) either Reinhard paid no attention to what Kreager was asking or 2) Kreager in fact only "consulted" Reinhard to the extent that she directed her to type a certain batch of letters, which Reinhard then typed without any conscious attention to the substance of what she was typing.

Kreager testified that, in hindsight, she realizes she should have paid more attention to the Fields memorandum. She spent little time looking at it back in 1981 when she acted upon it. However, looking at it more closely at the time of trial, she found it to be ambiguous. On the one hand, it referred to Dr. Simonds' violation of the assignment agreement; yet, it also used the words "suspend" and "suspension." Kreager testified that she did not know there could be more than one meaning to "suspend." To her, it was just a category that referred to the "suspended provider" section of the Part B manual. If the memorandum had specifically referred to Dr. Simonds as an "assignment violator," Kreager testified that she would have directed that the "assignment violator" form letter be sent. She testified that sending "suspended provider" letters was a routine matter in her department.

Kreager explained that she never "read" the letter in the sense of thoroughly digesting its contents. However, she understood that the form letter she used applied only when a doctor had been convicted of a criminal offense. She testified that no internal rules required her to independently investigate whether the doctor had in fact been convicted. She assumed this had been done before she received a memorandum telling her that a doctor was to be "suspended."

Kreager testified that, at the time she dealt with Field's memorandum regarding Dr. Simonds, she had been a supervisor for only a short period of time.[3] She considered herself poorly trained for that position. No one had ever told her to be cautious about sending out "suspended provider" letters.

Kreager testified that, after the letters were typed, either she or someone at her direction placed them on the desk of her manager, Dave Fuson, for signature. Kreager testified that she was sure that

---

**3.** From the testimony of Dave Fuson, it appears that Kreager had been in her position for at least three months.

Fuson signed them. She said she recalled that fact specifically because he later told her that he would never again sign another letter like that.[4]

Dave Fuson, who was at the time Assistant Manager of the Medical Review Department and Kreager's supervisor, testified that he had held responsibility for Part B claims for only a few months when this incident occurred. No one had advised him to be careful about what letters were sent to claimants. Fuson testified that, although the letters were prepared for his signature, he did not sign them. According to Fuson, the letters only came to his attention after they had been sent out.

The Court notes that the fourteen letters, in the form admitted at trial, do not contain the signature of Fuson. They show a blank signature block. No explanation was made when the letters were admitted into evidence. The Court concludes that this tends to support Fuson's testimony that he did not sign the letters.

A comparison of the fourteen letters in evidence with the form letter provided by HCFA in the Part B Manual for section 11034 violations reveals that the section 11034 form was the source of the letters. Thus, Blue Cross erred by relying on the wrong section of the manual.

A close comparison of the letters mailed with the form letter suggests even further involvement on the part of Blue Cross in the error that led to this suit. Although the letter sent out closely resembles the form letter supplied by HCFA in section 11034 of the Part B manual, the language at issue in this case appears to have been added by someone at Blue Cross. The form letter provided by the government in the Part B manual states that "Action is being taken because (BRIEFLY SUMMARIZE THE REASONS FOR THE SUSPENSION OR EXCLUSION OF THE PRACTITIONER IN QUESTION)." In the letter sent out by Blue Cross, the following language appeared: "Action is being taken because of Dr. Simonds conviction of a criminal offense related to his participation in the Medicaid (Title XIX) program." James Smith, of HCFA's Office of Program Integrity, testified that the particular language used was not supplied by HCFA to Blue Cross; thus, although the Court does not know *who* at Blue Cross at some time inserted the critical language into the form letter, the Court does conclude that it was someone from Blue Cross, rather than someone from the government agency, who did so.

As discussed below, the Court finds that these actions, when considered in combination, amount to gross negligence on the part of Blue Cross. However, as a finding of fact, the Court finds no intent or willfulness on the part of any Blue Cross employees. Although Dr. Simonds inferred in his testimony that Blue Cross may have sent out the letters with the specific purpose of causing him harm, the Court finds nothing in the record to support this allegation. All Blue Cross witnesses testified that they had never heard of Dr. Simonds prior to the incidents in question. The Court finds this evidence credible.

### E. *The "Retraction"*

On January 23, 1981, a letter was sent by Blue Cross to the individuals who received the first letter. The "retraction letter", in full, read as follows:

> Please disregard the letter you received from Blue Cross-Blue Shield of Michigan dated January 14, 1981. The information that the Medicare services rendered by Dr. Simonds, D.P.M. would be denied and that payment would not be made was erroneous.
>
> We regret that this information was incorrect. The action indicated in the letter is *not* being taken against Dr. Simonds and Medicare will continue to pay for approved items/services provided by him.
>
> Please accept our sincere apology for any inconvenience we may have caused you.

4. *The Court notes that no hearsay objection was* raised to this testimony.

As can be clearly seen from its text, the "retraction letter" failed to retract the most damaging portion of the first letter, the allegation that Dr. Simonds had been convicted of a criminal offense. The Court agrees with plaintiff's claim that the letter, by failing to retract the original accusation of criminal misconduct, in fact tends to confirm that accusation.

A number of witnesses testified as to the origin of the letter and the decision to send it in this particular form. Dave Fuson testified that, after he received a call from Simonds' attorney, he called HCFA in Chicago for advice. He was told to call Simonds's attorney, apologize, and draft a retraction letter. Fuson testified that he followed those instructions and, before sending the retraction letter out, read it to an attorney at HCFA's offices.

Although he could not recall for certain, Fuson testified that he thought he also read it to Simonds's attorney. He made this surmise because he did not think he would have sent it out without a favorable response from Dr. Simonds or his attorney.

Fuson could not explain why the retraction letter failed to refer to the criminal conviction. He did not recall anyone advising him at the time of the specific requirements of Michigan law regarding retractions of potentially defamatory material.

Joan Samuelson, a Prepayment Analyst who had never before drafted a letter for Blue Cross, testified that Dave Fuson and her supervisor had called upon her to draft an apology letter. She could not recall whether the letter she drafted was the one quoted above that went out to the individual patients or whether it was the separate letter ultimately sent to Simonds. In any case, she wrote the letter the day the task was assigned to her and turned it in to Fuson before leaving work. She considered her work product to be a first draft to be edited by Fuson or others. She did not consult an attorney or, for that matter, anyone else in its preparation. Because she never heard of the matter again, she assumed Fuson had taken care of it.

Samuel Starks, who was a Sanctions Coordinator for the Chicago regional office of HCFA, testified regarding his involvement in the preparation of the retraction letter. He did not recall having seen a copy of the retraction letter prior to the initiation of these legal proceedings. He testified that Fuson may have read the letter to him over the phone. Starks testified that he "did not and would not" have approved the letter because he did not believe he was in a position to tell Fuson what he could and could not say. Rather, his only concern was to make sure the contents of the letter were accurate. He assumed that the approval process for the retraction letter would constitute something more than just his approval. Although he is in fact an attorney, Starks testified that, since he was not practicing in that capacity for HCFA, he could not imagine that he would have given Fuson that information. He thought he *may* have told Fuson that he was going to talk to HCFA lawyers about the matter, but he was sure he did not give Fuson the impression that he was approving the letter as legally adequate.

William Redmond, Simonds' attorney, also testified. He confirmed that he spoke twice on the phone to Fuson. In the second call, Fuson read to him a draft of the retraction letter. Redmond testified that he did not tell Fuson at that time whether the proposed letter was acceptable or unacceptable. Rather, he asked that Fuson send a copy to him for his client's approval. No approval was given before the letter was sent out.

### F. *Testimony Regarding Damages*

Plaintiff Simonds testified that the letters have affected him in five ways: they have caused a reduction of business, they have negatively affected his good name and reputation, they have caused him physical pain, they have caused him mental pain and anguish, and they have affected his interrelationships with other people.

With respect to business losses, Dr. Simonds testified that, as soon as the letters

went out, patients started cancelling appointments for consultations and for surgeries. Seven of the patients who received letters never came back. Five of the patients who received letters had been referred by medical doctors; four out of the five doctors who made those referrals no longer refer patients to Dr. Simonds. Prior to the letters, those five doctors had referred a total of 79 patients to Dr. Simonds. After the incident, the one doctor out of the five who still made referrals sent a total of eight patients to Dr. Simonds. During the four years prior to the letters, Dr. Simonds had received 180 referrals from medical doctors throughout the area. During the four years after the incident, he obtained only 111 referrals from doctors in the community. Further, in the year prior to the letter, Dr. Simonds performed surgeries on 216 patients; in 1981, the year of the letter, he performed only 157.

Dr. Simonds testified that, during the five years prior to 1981, his business experienced an average increase in gross revenues of $30,000 per year and, in twenty-five years of practice, his gross revenues had never fallen. He testified that in 1981, after the letters were sent, his revenues fell $22,000 and in 1982 they fell $4,000.

In support of their claim for damages, plaintiffs moved into evidence the account sheets of Dr. Simonds' business for the years 1977–1982, which record income and disbursements. It is not clear from those records which figures should be used to determine what, if any, business losses were suffered. The Court notes that, in his testimony, plaintiff appeared to rely at one point on the *business* income figures in column 34 (to calculate the $22,000 loss from 1980–1981) but at another point on the *total* income, including an insurance refund, in column 35 (to calculate the $4,000 loss from 1981–1982). In its post-trial brief, defendant United States relies on the total income figure in column 35 AA, a total income figure not yet adjusted

by amounts described as "insurance refund" and "interest income." Defendant Blue Cross appears to rely on the same figure in the calculations in its post-trial brief. The Court agrees with defendants that the total income figure in column 35 AA is an appropriate figure to use.[5]

Relying on the total income figure, the following picture of Dr. Simonds' business is developed:

Income Prior to Letters:

|  | Total Income | Increase Over Previous Year |
|---|---|---|
| 1977 | $253,294.88 | -- |
| 1978 | $285,777.62 | $32,482.74 |
| 1979 | $330,681.40 | $44,903.78 |
| 1980 | $331,966.76 | $ 1,285.36 |
| Total Increase for 3 years: | $78,671.88 | |
| Average Increase: | $26,223.96/year | |

Income After Letters:

|  | Total Income | Increase Over Previous Year |
|---|---|---|
| 1981 | $320,802.09 | ( 11,164.67) (decrease) |
| 1982 | $318,111.37 | ( 2,690.72) |

Dr. Simonds also testified regarding physical problems that he suffered as a result of the letters. He testified that he suffered insomnia for six months and had to take medication to sleep, that he suffered from nausea, vomiting and diarrhea, and that he felt a tightness in his chest. Dr. Simonds' wife also testified and gave similar reports of Dr. Simonds' physical problems. Dr. Simonds explained that he visited a doctor to determine whether he was suffering from any cardiovascular problems. He testified that the doctor told him that the tightness in his chest was probably caused by emotional stress. No medical doctors testified at trial regarding Dr. Simonds' physical condition, nor are there any medical reports in the record regarding his physical symptoms.

Dr. Simonds testified that he suffered emotional trauma as well. He stated that

5. Although it might have been more useful to look at the gross revenues of the podiatry business only, Dr. Simonds apparently did not separate his podiatry business revenues from his total revenues until 1980. Thus, there is no means of comparing podiatry business revenues, as distinct from total revenues, for the years in question.

it was difficult to separate the emotional from the physical problems. As a result of the letters, Dr. Simonds claims he suffered a loss of patience, tolerance, composure, and ability to concentrate. He felt as if he were in constant turmoil. He became upset easily and lost his sense of humor. His changed personality affected his interactions with family, friends, and patients. Dr. Simonds testimony in this regard was corroborated by testimony of two members of his office staff, his daughter, his wife, and two of his longtime friends. All testified that the changes they observed occurred shortly after the letters were sent.

Plaintiffs also offered the testimony of Dr. Larry Irey, a clinical psychologist, by way of video tape deposition. Dr. Irey administered the Minnesota Multiphasic Personality Inventory to Dr. Simonds but concluded that its results indicated "a high degree of denial of problems, failure to admit or to recognize even a normal degree of human error, fault and conflict and therefore the entire MMPI was invalid." He also administered the Rorschach test which he described as more subjective and less easy to manipulate. From that test, Dr. Irey concluded that Dr. Simonds was an individual with a high degree of reactiveness, that is, an individual whose behavior and perceptions are going to be highly colored and affected by his feelings. He observed that Dr. Simonds had a tendency toward internalized self-criticalness, which is often associated with a tendency toward depression. He reported that Dr. Simonds had an "inability to acknowledge any problems at all, a high level of defensiveness, [and] a high level of needing to see himself in a highly positive light, even in spite of a situation that he was in that's quite unusual."

Dr. Irey further reported that, as a result of certain childhood experiences, Dr. Simonds was

> left with some rather strong feelings of insecurity about himself and a need to then over-compensate for that and put a lot of effort in presenting himself in a very strong, capable picture. But I think

that's a compensation, and I think that the Rorschach points out pretty clearly that he's not nearly as strong and secure as he would present himself. Underlying that would be some rather strong tendencies towards being easily disrupted by emotion, that his adaptability in a reasonable way is probably not really strong. And so the picture I have is one of a person who presents himself in a very strong over-compensating way to coverup some fairly difficult—or some weaknesses, some limitations in his ability to really adapt and cope with life.

Dr. Irey testified that, because of this personality profile, Dr. Simonds felt a need to present himself in a very virtuous light. An accusation of criminal behavior would be a basic assault against that self-perception. Accordingly, such an accusation would create strong negative psychological reactions which would interfere with his reasoning, judgment, and logical adaptive abilities. Dr. Irey predicted that someone like Dr. Simonds would become preoccupied, depressed, irritable, and sometimes overtly hostile in response to letters such as those sent in this case.

From the testimony of Dr. Simonds and that of family members, co-workers, and friends who observed his behavior, the Court concludes that Dr. Simonds did in fact, to some extent, respond in the ways predicted by Dr. Irey. The record shows that Dr. Simonds was more torn than might have been an ordinary person by the events that followed the mailing of the letters.

## II. CONCLUSIONS OF LAW

### A. *Sovereign Immunity*

In its November 22, 1982, opinion, this Court concluded that Blue Cross, as an administrator of Medicare benefits under the auspices of the Secretary of Health and Human Services, is an agent of the United States. In that capacity it is entitled to sovereign immunity.

This Court went on to rule, however, that Blue Cross was entitled to sovereign immu-

nity only to the extent that the monetary relief sought would ultimately be paid from the treasury of the United States. The carriers' contract between Blue Cross and the government specifically addresses when that result occurs:

> [i]n the event the Carrier [Blue Cross] or any of its directors, officers, or employees ... are made parties to any judicial ... proceeding arising, in whole or in part, out of any function of the carrier under this agreement, the amounts of any judgment ... incurred by the Carrier ... shall be reimbursable unless the liability underlying the judgment ... was the direct consequence of conduct on the part of the Carrier determined by judicial proceedings ... to be criminal in nature, fraudulent, or grossly negligent.

Based on the contract language, the Court ruled that plaintiffs would not be barred by sovereign immunity if they could prove at trial that the conduct of Blue Cross in this case was grossly negligent.

One issue the Court must resolve at this point is what the parties meant when they contractually determined that Blue Cross would be liable only if it were "grossly negligent." An issue very similar to this has been addressed in a well-reasoned opinion by the Michigan Court of Appeals. *Nationwide Insurance v. Detroit Edison*, 95 Mich.App. 62, 289 N.W.2d 879 (1980). In that case, the court was required to interpret a lease in which a landlord waived all right to recovery from a tenant, "except as to such losses resulting from wilful or gross neglect on the part of tenants." *Id.*

The *Nationwide* court began its analysis by noting that, as a general rule, where terms having a definite legal meaning are used in a written contract, the parties to the contract are presumed to have intended such terms to have their proper legal meaning, absent a contrary intention appearing in the instrument. 95 Mich.App. at 64, 289 N.W.2d at 881; 17 Am.Jur.2d *Contracts* § 249 at 642 (1964). The court attempted to follow that general rule by looking to Michigan common-law for a definition of "gross neglect." It found that, as a matter of common-law, gross negligence was a concept applicable only to the doctrine of last clear chance. Because that doctrine had no relation to the case at bar, the court turned to Prosser's definition of gross negligence, a "failure to exercise even that care which a careless person would use." Prosser, *Torts* § 34, at 183–84 (4th ed. 1971). The court adopted Prosser's definition for the purpose of interpreting the contract at issue:

> In the instant case, we believe that by the term "gross neglect", the parties intended some form of negligence greater than ordinary negligence, but less than conduct bordering on deliberateness. Therefore, we conclude that for purposes of this lease, when the parties employed the term "gross neglect", they meant that defendant would be liable for failure to exercise the degree of care that even a careless individual would employ under the circumstances.

95 Mich.App. at 67, 289 N.W.2d at 882.

Similarly, in this case, the meaning of "gross negligence" within the context of the last clear chance doctrine has no application to the facts of this case. Thus, the Court must look elsewhere in its search for the meaning intended by the contracting parties. The definition provided by the Michigan Court of Appeals in *Nationwide* appears to be as applicable in this case as it was on those facts. Accordingly, the issue of sovereign immunity in this case turns on the determination whether the conduct of Blue Cross constituted a failure to exercise even that care which a careless person would use.

The Court would have no reservation in determining that a number of aspects of Blue Cross' conduct in this case amounted to *simple* negligence. Among the incidents of negligent conduct involved in sending the allegedly defamatory letters are:

> —Edith Fields' failure to clearly transmit to Josephine Kreager the explicit instructions she received from HCFA directing her to treat Dr. Simonds as an

assignment violator pursuant to section 11027 of the Part B manual.

—Josephine Kreager's failure to carefully read the memorandum from Fields and, if she still had found it ambiguous at that point, failure to question Fields regarding the appropriate procedures.

—Janet Reinhard's failure to recognize that she was typing a "suspended provider" letter to someone she had herself independently identified as an "assignment violator."

—Josephine Kreager's and Roberta Black's failure to ensure that the letters had been signed by the manager in charge before they were mailed or, even resolving this conflict in the evidence the other way, Dave Fuson's failure to investigate the accuracy of letters he signed.

—Blue Cross's failure to caution employees responsible for sending out letters accusing physicians of criminal conduct that such letters are potentially defamatory and can only be sent out when there is no question but that the doctor was in fact convicted of such a crime, especially Blue Cross's failure to pass this information along to new supervisory employees with responsibilities such as those of Kreager and Fuson.

—Blue Cross's failure to institute some internal safeguarding procedure to ensure that errors of the magnitude that occurred in this case do not occur.

—Blue Cross's adaptation of the section 11034 form letter to include the criminal conviction language without providing adequate instructions for when that particular form letter was to be used.

Even after plaintiff Simonds, through his attorney, brought to Blue Cross's attention its initial mistake, the errors continued:

—Fuson assigned the task of drafting the retraction letter to an employee who had never before drafted any letters for Blue Cross, let alone letters of such importance.

—Fuson approved and sent out the retraction letter without retracting the most damaging portion of the initial letter—the accusation that Dr. Simonds was a convicted criminal.

—Fuson sent out a retraction without obtaining the approval of Simonds or the approval of any Blue Cross or governmental attorneys.

■ Looking at any one piece of the chronology in isolation, the Court might conclude that Blue Cross committed nothing more than simple negligence. However, considering the totality of circumstances, the Court concludes that the "multiple acts of negligence, each of which had a cumulative effect, amounted to the commission of gross negligence." *Nationwide Ins. v. Detroit Edison*, 95 Mich.App. at 69, 289 N.W.2d at 883. Together, they constitute a failure to exercise even that care which a careless person would use. *Cf.* 57 Am.Jur.2d *Negligence* § 104, at 455–56 (1971) (explaining that, even when the constituent elements of some conduct, standing alone, may amount to no more than ordinary negligence, the particular combination of the elements may constitute wilful or wanton behavior).

Plaintiff has argued that, in determining whether gross negligence exists, the Court should consider the doctrine that "the degree of care required in any business must be proportionate to its nature and risks." *Michigan Central Railroad Co. v. Coleman*, 28 Mich. 440, 448 (1874); *see also DeJager v. Andringa*, 241 Mich. 474, 475–76, 217 N.W. 332, 333 (1928). Although later cases have limited *Michigan Central* and *DeJager* by holding that courts may not instruct juries that a "higher degree of care" is appropriate in some circumstances as compared to others, they have not substantially changed the basic principle, *Felgner v. Anderson*, 375 Mich. 23, 30, 133 N.W.2d 136, 140 (1965); *Frederick v. City of Detroit*, 370 Mich. 425, 121 N.W.2d 918 (1963). The measure of duty in any negligence case is the "reasonable care appropriate to the circumstances of the case." *Felgner*, 375 Mich. at 30, 133 N.W.2d at

140. One factor that the Court has considered, as factfinder in this case, is the potential harm to physicians falsely accused of crimes. Given that great risk, Blue Cross had an obligation to provide a correspondingly high level of protections and safeguards. Instead, Blue Cross failed to adequately train its employees and allowed them to stumble into the many errors described above. In the Court's judgment, this is gross negligence. Accordingly, the Court finds that plaintiffs' action is not barred by sovereign immunity.

### B. *Elements of Libel*

■ In general, a defendant is guilty of libel under Michigan law if: 1) he made a statement of fact to a third party in a written document; 2) the statement was of and concerning the plaintiff; 3) the statement was false in some material respect and had a tendency to harm the plaintiff's reputation; and 4) the statement was the cause of special harm, that is, actual damages, to plaintiff. *See* Michigan Standard Jury Instructions 2d § 118.05; Mich.Law & Prac. *Libel and Slander* §§ 2, 11 (1957).

When the statement is an accusation of a crime, as in this case, the statement is defamatory per se and is actionable without proof of special harm or loss of reputation. *Wilkerson v. Carlo*, 101 Mich.App. 629, 632, 300 N.W.2d 658, 659 (1980); *Tumbarella v. Kroger Co.*, 85 Mich.App. 482, 493, 495, 271 N.W.2d 284, 289, 290 (1978); *see* Mich.Comp.Laws Ann. § 600.2911(1) (1968).

Thus, plaintiffs need only prove the first three elements to establish libel in this case. As can be clearly seen from the above discussion of the facts, plaintiffs have proven each of those elements. The letters were sent to and received by at least fourteen patients of Dr. Simonds. They specifically referred to him and informed those patients that he had been convicted of a crime involving the Medicaid program. That statement was false.

### C. *Qualified Privilege*

Defendant Blue Cross claims that it is entitled to a qualified privilege and that plaintiff must, therefore, prove actual malice to prevail. Blue Cross argues that it is entitled to a qualified privilege: 1) because Dr. Simonds was a public figure and 2) because it had a privilege, under the circumstances, to communicate the information contained in the letters to the patients. The Court finds neither of these arguments persuasive.

### 1. *Public Figure*

■ Blue Cross argues that Dr. Simonds is a public figure within the meaning of *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and *Vandentoorn v. Bonner*, 129 Mich.App. 198, 342 N.W.2d 297 (1983). Blue Cross claims that, as a public figure, Dr. Simonds must prove "actual malice" in order to prevail.

As the Michigan Court of Appeals noted in *Vandentoorn*, an individual may be a "public figure" in two different ways:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

129 Mich.App. at 204–05, 342 N.W.2d at 300 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 3012–13, 41 L.Ed.2d 789 (1974).

When an individual obtains public prominence in the latter sense, with respect to only a limited range of issues, the qualified privilege is correspondingly limited. In that case, the qualified privilege extends only to comments respecting the individual's conduct regarding that limited range of issues. *Vandertoorn*, 129 Mich.App. at 205, 342 N.W.2d at 300–01.

Blue Cross argues that Dr. Simonds is a public figure because he assumed a leadership role in the podiatry profession, served on the podiatric practice board of the Michigan Department of Licensing and Regulation, served on the Board of Trustees of School College in Chicago, and became involved in other civic activities. Assuming arguendo that Dr. Simonds was a public figure with respect to these limited issues, the Court finds that the corresponding qualified privilege does not extend as far as defendants attempt to stretch it. Defendants do not claim that they sent the letters in order to make a statement regarding Dr. Simonds' service in any of the above named capacities. The letters were sent out by mistake as a result of a determination that Dr. Simonds had violated the terms of a Medicare assignment agreement, a determination that had nothing to do with any of Dr. Simonds' public service endeavors. Hence, the Court finds that Blue Cross is not entitled to a qualified privilege on this ground.

## 2. Duty to Communicate

The Michigan Supreme Court has also recognized a qualified privilege in circumstances where a defendant has a duty to communicate certain information to a third person. In *Lawrence v. Fox*, 357 Mich. 134, 140–41, 97 N.W.2d 719, 722 (1959), the court adopted the explanation of this privilege set forth in the Restatement of Torts. Section 598 of the Restatement described the specific privilege asserted in this case:

> An occasion makes a publication conditionally privileged if the circumstances induce a *correct or reasonable belief* that
>
> (a) there is information that affects a sufficiently important public interest, and
>
> (b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true.

*Restatement (Second) of Torts* § 598 (1977) (emphasis supplied); *see also Rouch v. Enquirer & News*, 137 Mich.App. 39, 50, 357 N.W.2d 794, 801 (1984) (citing *Lawrence* and relying on the definition provided in § 598 of the Restatement). As explained elsewhere:

> A publication is conditionally or qualifiedly privileged *where circumstances exist, or are reasonably believed by the defendant to exist,* which cast on him the duty of making a communication to a certain other person to whom he made such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do.

*Timmis v. Bennett*, 352 Mich. 355, 368–69, 89 N.W.2d 748, 754–55 (1958) (emphasis supplied); *see also Bostetter v. Kirsch Co.,* 319 Mich. 547, 558, 30 N.W.2d 276, 280 (1948).

Blue Cross argues that it is protected by such a qualified privilege in this case. In general, when physicians are suspended from the Medicare program, Blue Cross has the obligation to inform patients who submit claims for those doctors' services that Medicare will not honor their claims. Blue Cross argues that it does not lose the qualified privilege merely because it erred by sending the wrong letters.

The Court agrees that, if HCFA had told Blue Cross that Dr. Simonds was a suspended provider who had been convicted of a crime, the qualified privilege would protect defendant in this case. However, when HCFA initially directed Blue Cross to take action, it did so by sending a letter that very explicitly identified Dr. Simonds as an assignment violator who should be dealt with pursuant to section 11027 of the manual. Blue Cross therefore only had a qualified privilege to transmit that specific information to patients who were affected by the revocation of Dr. Simonds' assignment privileges.

Instead, Blue Cross transmitted *different* information to parties *not* affected by

the actual revocation. The testimony at trial established that only one of fourteen patients who received the letter had assigned her Medicare claims to Dr. Simonds. The other thirteen, who paid Dr. Simonds directly, were unaffected by a revocation of his assignment rights. Further, HCFA's letter stated that Dr. Simonds was an assignment violator pursuant to section 11027. Instead of transmitting that information, Blue Cross told the fourteen patients that Dr. Simonds was a convicted criminal who had been totally suspended from the Medicare program. In the Court's judgment, Blue Cross did not have a "reasonable belief," as required by the above quoted caselaw, that the information it provided to the patients was true. Accordingly, the Court holds that a qualified privilege does not arise.

## D. *Damages*

Having concluded that plaintiffs have successfully proven libel and that defendant Blue Cross is not entitled to a qualified privilege, the Court must determine the extent of plaintiffs' damages.

### 1. *Compensatory*

■ The Court finds that plaintiffs have established business losses of $103,691.94 for the years 1981–82. The business account sheets, as described above, show an average yearly increase in gross revenues of $26,223.96 for the three years prior to publication of the defamatory letters. The account sheets also show a decrease in income the two years following publication of the letters. Defendants have offered no evidence to contradict the reasonable inference that the increase in revenues prior to January 1981 indicates a trend that would have continued but for the letters. Nor have they suggested any reason, other than the letters, that explains the decrease in revenues.[6] From the available information, the Court concludes that plaintiffs were injured in 1981 in the amount of $23,-233.96, the anticipated increase they failed to achieve, plus $11,164.67, the decrease in revenues they actually suffered, for a total of $37,388.63. In 1982, plaintiffs were injured in the amount of $52,447.92, the increase they had failed to achieve over the two years after 1980, plus $13,855.39, the decrease in their revenues as compared with 1980, for a total of $66,303.31 in 1982. The total loss in 1981–82 is $103,691.94.

The Court finds, however, that plaintiffs failed to carry their burden of proving damages for any year after 1982. Although plaintiff Simonds testified that he felt his business had been injured by $250,000 for the years 1982–85, no evidence was submitted to prove what the business earnings were during those years. The Court cannot indulge in speculation when awarding damages. *Sias v. General Motors Corp.*, 372 Mich. 542, 550, 127 N.W.2d 357, 362 (1964). Hence, no business losses will be awarded for the years 1982–85.

■ The Court finds that plaintiff Simonds is entitled to an award of $10,000.00 to compensate him for physical pain and suffering. His testimony in this regard was corroborated by that of his wife, who observed his discomfort. Although there is no evidence that Dr. Simonds received medical treatment and although it appears that Dr. Simonds continued to work a rigorous schedule despite his physical ailments, the Court does not doubt that he suffered some physical pain.

■ The Court further finds that plaintiff Simonds is entitled to an award of $150,000.00 to compensate him for emotional pain and anguish. Simonds testified extensively regarding the mental anguish he suffered as a result of the letters. The Court finds that Dr. Simonds reacted particularly strongly because he had long considered himself a crusader attempting to maintain integrity in the podiatric profession and demand respect from the medical health community. The letters personally attacked his integrity and damaged the respect that was so important to him. Fur-

---

**6.** Defendant Blue Cross suggests in its brief that this decrease was the result of the recessionary times. Defendants, however, introduced no evidence to this effect at trial.

ther, because he had so often in the past found himself at odds with Blue Cross in his attempts to achieve these goals, it was particularly painful to him to be so ineptly accused by Blue Cross. Dr. Simonds' testimony regarding his mental pain and anguish was corroborated.by the testimony of his wife, his daughter, two members of his office staff, two of his long-time friends, and Dr. Larry Irey, a clinical psychologist. The Court therefore finds that Dr. Simonds suffered significant mental anguish for which he deserves compensation in the amount of $150,000.00.

2. *Punitive*

■ Plaintiffs have also demanded punitive damages. To justify an award of punitive damages in a libel action, the finder of fact must determine that the publisher of the defamatory matter acted in bad faith or with ill will towards the plaintiffs. *Peisner v. Detroit Free Press*, 421 Mich. 125, 138, 141–42, 364 N.W.2d 600, 606, 608 (1984). The Court finds that Blue Cross did not act in bad faith or with ill will towards Dr. Simonds or his business. Accordingly, punitive damages are not appropriate.